UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

EMMA GOIDEL, ILANA LEE, MADELEINE
LEE, and LESLEY BROWN, on behalf of
themselves and all others similarly situated,

                    *Plaintiffs*,

      -against-

AETNA INC.;

               *Defendant*.

Case No. 1:21-cv-07619 (VSB)

**CLASS ACTION**

**FIRST AMENDED
COMPLAINT**

---

1.      Plaintiffs Emma Goidel, Ilana Lee, Madeleine Lee, and Lesley Brown, by and through their attorneys, Emery Celli Brinckerhoff Abady Ward & Maazel LLP and the National Women's Law Center, on behalf of themselves and others similarly situated, for their First Amended Complaint allege, upon personal knowledge as to themselves and information and belief as to other matters, as follows:

### PRELIMINARY STATEMENT

2.      This class action challenges Aetna's discriminatory health insurance policy that, on its face, engages in sex discrimination by denying LGBTQ (lesbian, gay, bisexual, transgender, queer, intersex, or non-binary) individuals equal access to fertility treatment.

3.      Plaintiffs, like many LGBTQ individuals, want to have children. And, like many LGBTQ individuals, they cannot conceive through intercourse with their partners and can become pregnant only through fertility treatments such as intrauterine insemination ("IUI") and in vitro fertilization ("IVF").

4.      Plaintiffs are all enrolled in Aetna insurance plans in New York, each of which provides broad coverage for IUI and IVF.

5.      Aetna interprets all of Plaintiffs' plans by reference to its own internal policy documents, including Clinical Policy Bulletin No. 0327—Infertility (the "CPB"). This CPB provides that infertility treatment shall be covered under Plaintiffs' plans without any out-of-pocket cost to individuals based on their representation that they have not gotten pregnant after having unprotected sex for 6 or 12 months, depending on their age.

6.      But Aetna's CPB requires individuals who cannot conceive through intercourse due to their sexual orientation or gender identity to pay *out of pocket* for 6 or 12 cycles of IUI *before* Aetna will provide them with coverage for fertility treatments.

7.      Aetna relied on this discriminatory CPB to deny coverage for each Plaintiff who sought fertility treatments.

8.      Because of Aetna's discriminatory system, Plaintiffs and all other similarly situated LGBTQ individuals have been forced to pay tens of thousands of dollars out of pocket—in Emma Goidel's case, for example, nearly $45,000 for one successful pregnancy—that others are not required to pay in order to become pregnant.

9.      Aetna's CPB language openly discriminates against Plaintiffs and other LGBTQ individuals based on their sexual orientation and gender identity and violates their rights under Section 1557 of the Patient Protection and Affordable Care Act ("ACA"), Section 296(2)(a) of the New York State Human Rights Law ("NYSHRL"), and Section 8-107(4) of the New York City Human Rights Law ("NYCHRL").

10.      Aetna's discriminatory guidelines exact an illegal tax on LGBTQ individuals and denies them their equal rights to have children.

11.      At best, these individuals incur great costs due to Aetna's discrimination.

12.     At worst, these exorbitant costs are prohibitive and entirely prevent people who are unable to shoulder them—disproportionately LGBTQ people of color—from becoming pregnant and starting a family.

13.     In addition to financial injury, Aetna's Policy has caused Plaintiffs and other LGBTQ individuals to suffer significant physical and emotional harm.

14.     Aetna's discrimination is deliberate. It has continued to enforce this discriminatory policy against Plaintiffs and other LGBTQ individuals despite the passage of Section 1557, despite the clear definition of sex discrimination under federal and state law to include LGBTQ individuals, and despite being specifically informed by the New York State agency that regulates Aetna and other health insurance issuers that such health insurance policies constitute illegal discrimination on the basis of gender identity and sexual orientation.

15.     Plaintiffs bring this case now, on behalf of themselves and all others who are unable to conceive through intercourse due to their sexual orientation or gender identity, to end Aetna's willful disregard of federal and state nondiscrimination law by prohibiting Aetna from implementing and enforcing this discriminatory policy in its New York health plans.

## JURISDICTION AND VENUE

16.     This Court has jurisdiction under 28 U.S.C. § 1331. This action arises under 42 U.S.C. § 18116(a).

17.     This Court has supplemental jurisdiction over the pendent state and city law claims under 28 U.S.C. § 1367(a).

18.     A substantial part of the acts complained of occurred in the Southern District of New York, and venue is lodged in this Court under 28 U.S.C. § 1391(b).

## THE PARTIES

19.     Plaintiff **EMMA GOIDEL** is a 31-year-old woman. At all relevant times, Emma has been a resident of New York State, and she has been enrolled in the Columbia University student health plan supplied and administered by Aetna, Inc. ("Aetna").

20.     Plaintiff **ILANA LEE** is a 37-year-old woman and a resident of New York State. Ilana is married to Plaintiff Madeleine Lee.

21.     Plaintiff **MADELEINE LEE** is a 30-year-old woman and is a resident of New York State. Madeleine is married to Plaintiff Ilana Lee.

22.     At all relevant times, Ilana and Madeleine Lee have been enrolled in an employer fully-insured Aetna health plan.

23.     Plaintiff **LESLEY BROWN** is a 32-year-old woman and is a resident of New York State. At all relevant times, Lesley has been enrolled in an employer self-insured health plan administered by Aetna.

24.     Defendant **AETNA** is a company incorporated under the laws of the State of Connecticut and whose principal place of business is in Hartford, Connecticut. Aetna is an insurance provider that supplies and administers health insurance plans for educational institutions, employers, and individuals in New York State. Aetna operates its business throughout the United States, including in New York State.

25.     Aetna receives federal financial assistance, including through credits, subsidies, and/or contracts of insurance. For example, Aetna provides coverage of medical services in exchange for payments through Medicaid.

26.     At all relevant times, Aetna has provided and administered student health plans for all Columbia University students, spouses, and dependents who choose to enroll in health insurance through the university, throughout all Columbia University schools. Aetna also

4

provides and administers student health plans for numerous other colleges and universities in the State of New York.

27.     At all relevant times, Aetna has supplied and administered fully-insured health plans to numerous employers throughout State of New York. Aetna has also administered self-insured health plans for numerous employers throughout the State of New York.

## FACTUAL ALLEGATIONS

### I.     <u>Aetna's Discriminatory Clinical Policy Bulletin</u>

28.     Aetna maintains documents called "Clinical Policy Bulletins" on which Aetna bases its coverage decisions, along with benefit plan documents.

29.     Aetna maintains a bulletin specifically to govern coverage of individuals' fertility treatments[1]: Clinical Policy Bulletin No. 0327—Infertility (the "CPB").[2]

30.     The CPB states:

> For purposes of this policy, a member is considered infertile if he or she is unable to conceive or produce conception after 1 year of ***frequent, unprotected heterosexual sexual intercourse***, or 6 months of ***frequent, unprotected heterosexual sexual intercourse*** if the female partner is 35 years of age or older. ***Alternately, a woman without a male partner*** may be considered infertile if she is unable to conceive or produce conception after ***at least 12 cycles of donor insemination*** (6 cycles for women 35 years of age or older).

31.     This means that, under an Aetna health plan that provides coverage for fertility treatments, there are only two ways to meet Aetna's definition of infertility for those under age 35: engaging in (1) "1 year of frequent, unprotected heterosexual sexual intercourse"

---

[1] For purposes of this complaint, the terms "fertility" services or treatment and "infertility" services or treatment will be used interchangeably. Plaintiffs seek equal access to services that will enable them to get pregnant, which they will refer to as fertility services or treatments, but those services are defined by Aetna to be "infertility" services or treatments as part of its "infertility program."

[2] Aetna, Infertility, Clinical Policy Bulletin No. 0327 (last revised Oct. 4, 2021), http://www.aetna.com/cpb/medical/data/300_399/0327.html.

or (2) 12 cycles of "donor insemination" (e.g., intrauterine insemination, or "IUI"[3]). For those age 35 and over, the same conditions apply, but the number of months or cycles required is reduced to 6.

32. Under the CPB, an individual who has the capacity to become pregnant through sexual intercourse with their partner can demonstrate infertility by simply representing to Aetna that they have had 12 or 6 months, depending on their age, of "frequent, unprotected heterosexual sexual intercourse" without a pregnancy.

33. Aetna imposes no out-of-pocket cost for such individuals to meet Aetna's definition of infertility.

34. But for Plaintiffs and other LGBTQ individuals, the only way to meet Aetna's definition of infertility is to pay out-of-pocket for 12 or 6 months of donor insemination.

35. Aetna therefore imposes significant out-of-pocket costs on LGBTQ individuals that it does not impose on others before allowing LGBTQ individuals to qualify for Aetna's insurance coverage for fertility treatment.

36. Aetna engages in this discriminatory conduct despite longstanding prohibitions against discrimination on the basis of sex in the New York Insurance Law. Under N.Y. Ins. Law § 3243(a)(1), for example, "no insurer shall because of sex . . . make any distinction or discrimination between persons . . . in any [] manner whatever." And under N.Y. Ins. Law § 3221(k)(6)(C)(viii), "[n]o insurer providing coverage" for IVF as required in large group plans in New York "shall discriminate based on . . . sex, sexual orientation, . . . or gender identity."

---

[3] Intrauterine insemination ("IUI") "is a procedure that places sperm past the cervix and in a woman's uterus around the time of ovulation." *Intrauterine Insemination (IUI)*, Am. Soc'y for Reprod. Med., https://www.reproductivefacts.org/news-and-publications/patient-fact-sheets-and-booklets/documents/fact-sheets-and-info-booklets/intrauterine-insemination-iui/ (last revised 2016).

II.   **Aetna Discriminates against Plaintiff Emma Goidel**

A.   **Emma is enrolled in Aetna's Columbia Policy**

37.   Since May of 2019, Emma and her spouse have been enrolled in Aetna's health plan for Columbia University ("Columbia Policy").[4]

38.   At all relevant times, Emma's spouse has been a Columbia University student, and Emma has been enrolled under the Columbia Policy as her spouse's dependent.

39.   Under the Columbia Policy, Aetna covers "services for the diagnosis and treatment (surgical and medical) of infertility" for enrollees between the ages of 21 and 44 (inclusive).

40.   "Infertility" is defined under the Columbia Policy as:

> a disease or condition characterized by the incapacity to impregnate another person or to conceive, defined by the failure to establish a clinical pregnancy ***after 12 months of regular, unprotected sexual intercourse or therapeutic donor insemination***, or after six (6) months of regular, unprotected sexual intercourse or therapeutic donor insemination for a female 35 years of age or older.

41.   The Columbia Policy states further that "[e]arlier evaluation and treatment may be warranted based on a Member's medical history or physical findings."

42.   Once a member qualifies for coverage under the Columbia Policy, Aetna covers "basic infertility services," which include fertility testing and evaluation.

---

[4] *See* Aetna, Aetna Student Health Plan Design and Benefits Summary: Columbia University, Policy No. 704502 (Policy Year 2020–2021), https://www.aetnastudenthealth.com/schools/columbia/pdbs2021.pdf (last visited Nov. 3, 2021).

43.     Under the Columbia Policy, Aetna also covers "comprehensive infertility services," including artificial insemination,[5] and "advanced infertility services," including "[t]hree (3) cycles per lifetime of in vitro fertilization,"[6] for those who demonstrate "infertility."

**B.      As a Same-Sex Couple, Emma and Her Partner Need Fertility Treatments to Become Pregnant and Have Their First Child.**

44.     Emma and her partner have long planned for a family with a total of four children.

45.     Because Emma cannot conceive through sexual intercourse with her partner, she requires fertility treatments, specifically IUI and/or IVF, to get pregnant for all their children.

46.     In 2018, Emma and her spouse decided to start their family.

47.     Emma and her partner were not covered by Aetna's Policy at that time.

48.     As a result of fertility treatments they obtained, Emma successfully became pregnant and gave birth to their first child in the summer of 2019.

**C.      Aetna Repeatedly Denies Coverage to Emma for Her Second Pregnancy Based on Its Discriminatory Policy.**

49.     Since May of 2019, Emma and her partner have been covered by Aetna's Columbia Policy, and they will remain enrolled in the Columbia Policy until at least December 2022.

50.     In 2020, Emma and her spouse decided to start pursuing fertility treatments for Emma to become pregnant again and have their second child.

---

[5] "Artificial insemination" includes "intra-uterine insemination [IUI]." Aetna, Infertility, Clinical Policy Bulletin No. 0327 at Sec. IV.A. (last reviewed Oct. 4, 2021), http://www.aetna.com/cpb/medical/data/300_399/0327.html
[6] In vitro fertilization ("IVF") is "method of assisted reproduction that involves combining an egg with sperm in a laboratory dish. If the egg fertilizes and begins cell division, the resulting embryo is transferred into the woman's uterus where it will hopefully implant in the uterine lining and further develop." *In Vitro Fertilization (IVF)*, Am. Soc'y for Reprod. Med., https://www.reproductivefacts.org/topics/topics-index/in-vitro-fertilization-ivf/ (last visited Aug. 17, 2021).

51.     In September 2020, in advance of attempting any IUI cycles, Emma's doctor submitted a claim to Aetna for preauthorization for six cycles of IUI.

52.     A representative from Aetna called Emma to determine her eligibility for enrollment in the infertility program.

53.     On September 21, 2020, Aetna formally denied Emma's enrollment in the infertility program and refused to cover her IUIs.

54.     Aetna's denial letter stated that its denial decision was based on the CPB: "Based on CPB criteria and the information we have, enrollment in the infertility program is denied" because "[y]ou do not meet any of the following criteria: unable to get pregnant after egg and sperm contact by either: (1) frequent, unprotected sex or (2) ***donor insemination if there is no male partner*** for at least (a) one year at any age, or (b) six months if older than 35."

55.     As a result of Aetna's discriminatory denial of coverage, Emma and her partner had to pay up front and out-of-pocket for fertility treatments.

56.     In the fall of 2020, Emma attempted two IUI cycles.

57.     Emma paid a total of $8,939 out of pocket for these two IUI cycles.

58.     The costs for IUI treatment include payments for donor sperm, payments to the fertility clinic for IUI treatments, and payments for prescription medications used as part of the IUI process.

59.     The first attempt in September was unsuccessful.

60.     On the second attempt in October, Emma became pregnant, but she then experienced a miscarriage and lost that pregnancy.

61.     Emma took time off to recover physically and emotionally from the miscarriage.

62.     In February 2021, Emma attempted her third IUI cycle.

63.     Emma paid $5,169 for this third IUI cycle.

64.     Her third IUI attempt was not successful, and she did not become pregnant.

65.     In March 2021, Emma appealed Aetna's September 2020 denial of preauthorization for six IUI cycles.

66.     In her appeal, Emma explicitly stated that Aetna's denial of coverage discriminated against her on the basis of her sexual orientation. Emma called Aetna's attention to a directive from the state agency that regulates Aetna, the New York Department of Financial Services ("DFS").

67.     DFS had just issued a bulletin in February 2021 making explicit that an insurance policy requiring LGBTQ individuals to pay out of pocket as a precondition for fertility treatments constitutes discrimination under N.Y. Ins. Law §§ 3221 and 4303.

68.     DFS's directive specifically noted:

> It has come to the Department's attention that some issuers may be requiring some individuals to incur costs, due to their sexual orientation or gender identity, that heterosexual individuals do not incur in order to meet the definition of infertility. In particular, some issuers have denied coverage of basic infertility treatments, such as intrauterine insemination procedures, for some individuals who are unable to conceive without such treatment due to their sexual orientation or gender identity. These individuals may incur the high costs of basic infertility treatments for up to 12 months to demonstrate infertility in order to qualify for insurance coverage due to their sexual orientation or gender identity. This results in unfair discrimination for individuals due to their sexual orientation or gender identity, which is

prohibited by Insurance Law §§ 3221(k)(6)(C)(viii) and 4303(s)(3)(H).[7]

69.     DFS's directive ordered that insurance "issuers must provide immediate coverage for basic infertility treatments (e.g., intrauterine insemination procedures) that are provided to individuals covered under an insurance policy or contract who are unable to conceive due to their sexual orientation or gender identity in order to prevent discrimination."[8]

70.     In March 2021, Emma attempted her fourth IUI cycle.

71.     Her fourth IUI attempt was unsuccessful, and Emma did not become pregnant.

72.     At this point, Emma's doctor raised the possibility of using IVF instead of IUI because it would have a greater chance of success.

73.     Because of Aetna's discriminatory system, Emma and her partner were faced with a choice: pay the steep out-of-pocket cost for a single cycle of IVF (with an increased chance of success) or continue paying the lower per-cycle out-of-pocket costs for additional rounds of IUI (with a decreasing likelihood of success).

74.     At this point, Emma and her spouse decided to try one more round of IUI because IVF was significantly more expensive, and Aetna refused to pay for any of these treatments.

75.     In April 2021, Emma attempted her fifth IUI cycle.

76.     Her fifth IUI attempt was unsuccessful, and Emma did not become pregnant.

---

[7] Lisette Johnson, Ins. Circular Letter No. 3, *Health Insurance Coverage of Infertility Treatments Regardless of Sexual Orientation or Gender Identity*, N.Y. Dep't of Fin. Servs. (Feb. 23, 2021), https://www.dfs.ny.gov/industry_guidance/circular_letters/cl2021_03.
[8] *Id.*

77.     Emma paid a total of $8,454.98 for her fourth and fifth IUI cycles.

78.     On April 19, 2021, Aetna sent Emma a final appeal determination upholding its September 2020 denial. The letter, again relying on the CPB, stated that Emma did not meet the criteria of being "unable to get pregnant after egg and sperm contact by either: (1) frequent, unprotected sex or (2) ***donor insemination if there is no male partner*** for at least (a) one year at any age, or (b) six months if older than 35."

79.     On April 20, 2021, Aetna sent a separate letter responding to Emma's allegation of discrimination. The letter did not explain how Aetna's CPB was not discriminatory and did not address the recent DFS directive. It summarily stated that Aetna was "guided by [its] Clinical Policy Bulletins," specifically that, "[i]n this situation, Aetna's review was guided by CPB Number 0327," and that Aetna was in "compli[ance] with federal civil rights laws."

80.     On April 23, 2021, Aetna sent a separate letter denying coverage for fertility medication prescriptions.

81.     After seven months, five cycles of IUI, one miscarriage, significant emotional distress, and over $20,000 paid out of pocket, Emma and her spouse decided, upon consulting with their doctor about the success rate of IVF versus IUI, to change course and try IVF.

82.     In May 2021, Emma's doctor submitted a claim for coverage of IVF to Aetna.

83.     A representative from Aetna again called Emma to determine her eligibility for fertility treatments.

84.     On May 14, 2021, Aetna formally denied coverage for Emma's IVF treatment.

85.     Again, Aetna's letter stated that its denial decision was based on the CPB: "Based on CPB criteria and the information we have, we're denying enrollment in the infertility program. The requirement for enrollment for a member under 35 years of age is that the member has been unable to conceive or produce conception after at least one year despite (1) frequent, unprotected *heterosexual sexual intercourse*, or (2) at least 12 cycles of *donor insemination if there is no male partner*."

86.     As a direct result of Aetna's discriminatory denial of coverage Emma had to pay $20,487.75 out of pocket to undergo IVF treatment.

87.     In May 2021, Emma began IVF.

88.     The IVF process is physically grueling, involving surgical egg retrieval, months of hormonal treatment via self-administered medication and injections, and frequent medical monitoring.

89.     In July 2021, Emma was overjoyed to learn she was pregnant as a result of IVF. But a few days later, she experienced an early miscarriage.

90.     Later that month, Emma and her partner decided that, rather than attempt another physically and financially taxing IVF so soon, Emma would attempt her sixth IUI cycle.

91.     Emma's sixth IUI cycle was successful; she became pregnant.

92.     Emma paid a total of $1,810 for this IUI cycle.

93.     At the time of filing this First Amended Complaint, Emma is fifteen weeks pregnant.

94.     At the time of filing this First Amended Complaint, Emma and her partner are paying to store one embryo that remains following Emma's IVF process and one vial of sperm, and they plan to use these in the future to fulfill their plan to have more children.

III.   **Aetna Discriminates against Plaintiffs Ilana and Madeleine Lee**

A.     **Ilana and Madeleine are enrolled in Aetna's Justworks Policy**

95.     Since July of 2019, Ilana and Madeleine have been enrolled in an Aetna employer-sponsored health plan provided by Justworks Employment Group LLC ("Justworks"), a third-party human resources management company contracted by Madeleine's employer Covera Health ("Justworks Policy"), and they will remain enrolled in Aetna's Justworks Policy for the foreseeable future.

96.     Madeleine is enrolled in the Justworks Policy as an employee, and Ilana is enrolled as Madeleine's dependent.

97.     Under the Justworks Policy, Aetna covers "services for the diagnosis and treatment (surgical and medical) of Infertility . . . ."

98.     "Infertile/Infertility" is defined under the Justworks Policy as "[a] disease defined by the failure to conceive a pregnancy after 12 months or more of timed intercourse or egg-sperm contact for women under age 35 (or 6 months for women age 35 or older)."

99.     A member is "eligible for Infertility services" under the Justworks Policy if the member has "met the requirement for the number of months trying to conceive through egg and sperm contact."

100.    Under the Justworks Policy, Aetna provides "[b]asic Infertility services," including testing and evaluation, "to a Member who is an appropriate candidate for Infertility treatment."

101.    Under the Justworks Policy, if "basic Infertility services" do not result in increased fertility, Aetna also covers "comprehensive Infertility services," including artificial insemination, and "advanced Infertility services," including IVF.

102.     The Justworks Policy states further that Aetna's "clinical policy bulletins explain our policy for specific services" and that Aetna "use[s] these bulletins and other resources to help guide individualized coverage decisions under our plans." It states specifically that "CPBs guide [Aetna] in deciding whether to approve a coverage request."

**B.     Ilana and Madeleine Need Fertility Treatments to Become Pregnant.**

103.     Ilana and Madeleine want a family with at least two children, and they each want to carry a pregnancy.

104.     Because Ilana and Madeleine cannot conceive through sexual intercourse, they both require fertility treatments in order to get pregnant.

**C.     Aetna Denies Coverage to Ilana Based on Its Discriminatory CPB.**

105.     In 2020, Ilana and Madeleine decided to start their family, and they began pursuing fertility treatments for Ilana to become pregnant.

106.     In August 2020, in advance of attempting any IUI cycles, Ilana's doctor submitted a claim to Aetna for preauthorization for one cycle of IUI.

107.     On September 3, 2020, a representative from Aetna called Ilana to determine her eligibility for enrollment in the infertility program.

108.     During the phone call, the Aetna representative asked a number of questions to confirm that Ilana met various eligibility requirements. Ilana, unaware of Aetna's discriminatory policy, believed the call was going smoothly and that she would meet Aetna's requirements for coverage of fertility treatments.

109.     But then Ilana mentioned her wife, Madeleine. Upon hearing the word "wife" and confirming that Ilana was married to another woman, the Aetna representative's tone completely changed. The Aetna representative told Ilana that, regardless of her answers to the

previous eligibility questions, because Ilana was in a same-sex marriage, her fertility treatment would not be covered until she had paid out-of-pocket for six cycles of IUI.

110.    On September 10, 2020, Aetna formally denied Ilana's enrollment in the infertility program and refused to pay for her IUI.

111.    Aetna's denial letter stated that it used the CPB to deny Ilana's request for coverage. Mirroring the language of the CPB, the denial letter stated that Ilana had not met Aetna's definition of infertility because she had not shown "the inability to get pregnant after egg and sperm contact by either: (1) frequent, unprotected sex or (2) *donor insemination if there is no male partner* for at least (a) one year at any age, or (b) six months if older than 35."

112.    On September 11, 2020, Aetna also formally denied Ilana coverage for a medication that is often used to ensure ovulation at a particular time in order to enhance effectiveness of an IUI procedure (commonly known as a "trigger shot").

113.    Aetna's denial letter for the trigger shot used language identical to its letter denying coverage of the IUI, stating that Aetna used the CPB in deciding to deny Ilana's request for coverage and that Ilana had not met its definition of infertility because she had not shown "the inability to get pregnant after egg and sperm contact by either: (1) frequent, unprotected sex or (2) *donor insemination if there is no male partner* for at least (a) one year at any age, or (b) six months if older than 35."

114.    As a result of Aetna's discriminatory denial of coverage, Ilana and Madeleine had to pay up front and out-of-pocket for Ilana's fertility treatments.

115.    Aetna's denial was devastating to Ilana and Madeleine. As Ilana was 36 years old and her fertility was decreasing with her age, Ilana and Madeleine worried that it would take many IUI attempts for Ilana to become pregnant. Their fertility clinic projected that each

IUI attempt would cost around $2,500. This cost, especially when multiplied by the many cycles they anticipated it would take for Ilana to get pregnant, was prohibitive. Ilana and Madeleine feared that they might not be able to afford to become pregnant at all.

116.    Ilana and Madeleine's fertility clinic, however, told them that it was possible to cut costs by foregoing components of IUI treatment recommended by their doctor.

117.    Thus, in order to salvage their dream of becoming pregnant, because Aetna was forcing them to pay out-of-pocket, Ilana and Madeleine decided to forego two crucial elements of the IUI treatment plan recommended by their doctor.

118.    Normally, an IUI cycle involves the patient coming to their doctor's fertility clinic multiple times during the first two weeks of their cycle, beginning 1–3 days after they get their period. At these clinic visits, called "monitoring" visits, the fertility doctor monitors the growth of follicles in the patient's ovaries via transvaginal ultrasound and changes in the patient's hormone levels via blood draws. These monitoring visits enable the fertility doctor to more accurately predict the patient's ovulation and to time the IUI procedure to optimize the patient's chances of becoming pregnant. Fertility doctors also often recommend that patients use a trigger shot to further optimize the chances of a successful IUI.

119.    But because Aetna had denied coverage for Ilana's IUI treatment, in order to reduce their financial burden, Ilana and Madeleine decided to forgo these medically recommended components of IUI treatment—monitoring and trigger shot—which their doctor had specifically recommended for Ilana.

120.    To try to mitigate the reduced efficacy that their doctor feared would result from foregoing the monitoring and trigger shot, Ilana decided to use letrozole—a fertility medication that causes ovaries to produce multiple eggs during ovulation instead of the usual one

egg. Letrozole increases the chance of a successful IUI, but it also creates the risk that multiple eggs become fertilized instead of just one. Because of Aetna's discriminatory policy, Ilana and Madeleine assumed the risk of Ilana becoming pregnant with multiples, an outcome which would have created a high-risk and high-cost pregnancy for Ilana.

121.    Aetna's denial forced Ilana and Madeleine to decide between chancing a high-risk pregnancy and running out of money before Ilana could become pregnant at all. If Aetna had not denied coverage for Ilana's fertility treatment, Ilana would have obtained in-clinic monitoring and would have used a trigger shot, and she would not have risked a high-risk pregnancy by using letrozole.

122.    In late September, October, and November of 2020, Ilana attempted three IUI cycles. Each time she used letrozole.

123.    Ilana and Madeleine paid a total of $4,910 out of pocket for these three IUI cycles.

124.    The costs for IUI treatment include payments for donor sperm and payments to the fertility clinic for IUI treatments.

125.    The first two attempts were unsuccessful.

126.    On the third attempt in November 2020, Ilana became pregnant.

127.    In August 2021, Ilana gave birth to her and Madeleine's first child.

**D.    Madeleine Plans to Become Pregnant While Enrolled in Aetna's Justworks Policy.**

128.    Ilana and Madeleine intend to start trying to become pregnant again and to have their second child within the next year or two. Madeleine will carry the couple's next pregnancy.

129.    As Madeleine has no reason to expect her employment to change during this time, they anticipate that they will still be enrolled in Aetna's Justworks Policy when Madeleine begins fertility treatments to become pregnant.

**IV.    Aetna Discriminates Against Plaintiff Lesley Brown**

**A.    Lesley Is Enrolled in an Employer Health Plan Administered by Aetna**

130.    Since March 2021, Lesley and her wife, Areum Kim, have been enrolled in a self-insured employer health plan provided by Areum's employer, ICON Clinical Research LLC, and administered by Aetna ("ICON Policy"). They will remain enrolled in the Aetna-administered ICON Policy for the foreseeable future.

131.    Areum is enrolled in the ICON Policy as an employee, and Lesley is enrolled as Areum's dependent.

132.    Under the ICON Policy, Aetna administers coverage for "diagnosis and treatment" of infertility.

133.    Under the ICON Policy, Aetna administers coverage for "Comprehensive Infertility Services," including "Artificial Insemination and Ovulation Induction;" and coverage for "Advanced Reproductive Technology (ART)," including IVF.

**B.    Aetna Denies Coverage to Lesley Based on Its Discriminatory CPB.**

134.    Lesley and Areum want a family with three children. Because they cannot conceive through sexual intercourse, they require fertility treatments to become pregnant.

135.    In 2021, they decided to start their family, and they began pursuing fertility treatments for Lesley to become pregnant.

136.    In August 2021, in advance of attempting any IUI cycles, Lesley's fertility clinic submitted a claim to Aetna for preauthorization for one cycle of IUI.

137.    On August 20, 2021, Aetna formally denied Lesley's clinic's request for coverage of IUI.

138.    As it had with co-Plaintiffs Emma and Ilana, Aetna's denial letter to Lesley stated that it used the CPB in deciding to deny Lesley's request for coverage. Again mirroring the language of the CPB, the denial letter stated that Lesley had not met Aetna's definition of infertility because she had not shown "the inability to get pregnant after egg and sperm contact by either: (1) frequent, unprotected sex or (2) *donor insemination if there is no male partner* for at least (a) one year at any age, or (b) six months if older than 35."

139.    As a result of Aetna's discriminatory denial of coverage, Lesley and Areum had to pay up front and out-of-pocket for Lesley's fertility treatments.

140.    In August and September of 2021, Lesley underwent two cycles of IUI.

141.    Lesley and Areum paid a total of $6,160 out-of-pocket for these two IUI cycles.

142.    These costs included the costs of IUI treatment and sperm costs.

143.    Neither cycle was successful.

144.    At the time of filing this First Amended Complaint, Lesley is not pregnant.

145.    Lesley plans to undergo another IUI in November 2021. Because of Aetna's discrimination, Lesley will have to pay out-of-pocket yet again.

**V.    Aetna Has Caused Plaintiffs Emotional Distress and Physical and Financial Injury.**

146.    Plaintiffs have been injured by Aetna's discriminatory system that requires them and other individuals, based on their sexual orientation or gender identity, to pay out of pocket for fertility treatments as a prerequisite to receiving coverage for such services.

147.   Emma has incurred tens of thousands of dollars in medical costs for the six IUI cycles and one IVF cycle that she has undergone due to Aetna's discrimination.

148.   Emma will also endure further financial injury by paying recurrent out-of-pocket costs to store embryo and sperm that she intends to use at a later date.

149.   Ilana, Madeleine, and Lesley have also incurred thousands of dollars in medical costs for their IUI treatments due to Aetna's discrimination.

150.   Lesley is experiencing ongoing injury right now, being forced to pay out-of-pocket for another round of IUI scheduled for November and additional rounds thereafter if the next one is unsuccessful.

151.   Plaintiffs have also endured great emotional distress in having to choose a course of treatment based on cost, rather than based on their personal and medical circumstances in consultation with their doctors. Had Aetna covered fertility treatments for Plaintiffs from the start, they each would have been able to choose the best course of treatment for them based on their personal circumstances, in consultation with their doctors. Instead, because of its discriminatory guidelines, Aetna has caused Plaintiffs to undertake immense financial, physical, and emotional costs.

152.   For example, Emma delayed trying IVF because of its cost. After her fourth cycle of IUI, her doctor presented IVF as an option based on her medical history and because IVF had a greater likelihood of success than IUI. But due to the immense out-of-pocket costs of IVF, Emma delayed this more effective treatment.

153.   Delays in medically recommended treatment have likely resulted in Emma becoming pregnant at a more advanced age than she would have absent Aetna's Policy.

154.    The delays caused by Aetna's discriminatory Policy threaten the health of Emma and of her future children, and her ability to get pregnant again in the future. That is because it becomes increasingly difficult to get pregnant with age. Pregnancy also becomes increasingly dangerous to a pregnant person's health, as well as to the health of the fetus, with age.

155.    Similarly, because of the cost she was forced to bear as a result of Aetna's discrimination, Ilana made choices about her fertility treatment that decreased the likelihood of her becoming pregnant and risked her health by increasing the likelihood of a high-risk pregnancy if she did become pregnant. She made these choices because of the cost Aetna forced upon her despite the fact that, at 36 years old, her fertility was already decreasing and her risk of a high-risk pregnancy was already increasing with age.

156.    Plaintiffs have also endured great emotional distress with each failed attempt to get pregnant.

157.    The knowledge that they were being subjected to unequal, discriminatory treatment by having to pay for multiple attempts at pregnancy compounded this emotional distress.

158.    Aetna's discrimination is causing Plaintiffs ongoing emotional distress because they know that as they pursue fertility treatments or when they again pursue fertility treatments in the future, they will again have to confront Aetna's discriminatory system and will again be forced to spend thousands of dollars out of pocket to become pregnant.

## VI.    <u>Class Allegations</u>

159.    Plaintiffs seeks prospective injunctive relief and damages on behalf of two classes of similarly situated individuals under Rule 23(b)(2) and (b)(3), respectively, of the Federal Rules of Civil Procedure ("Plaintiff Classes").

160.    The Plaintiff Class under Rule 23(b)(3) comprises all individuals who, while covered by a health plan provided or administered by Aetna in New York, have been denied coverage for fertility treatment by Aetna because the individual, due to their sexual orientation or gender identity, cannot meet Aetna's prerequisite of showing an inability "to conceive or produce conception after 1 year of frequent, unprotected heterosexual sexual intercourse, or 6 months of frequent, unprotected heterosexual sexual intercourse if the female partner is 35 years of age or older;" or, "[a]lternately," inability "to conceive or produce conception after at least 12 cycles of donor insemination (6 cycles for women 35 years of age or older)."

161.    The Plaintiff Class under Rule 23(b)(2) comprises all individuals who are or will be covered by a health plan provided or administered by Aetna in New York and who will be denied coverage for infertility treatment in the future because the individual, due to their sexual orientation or gender identity, will not be able meet Aetna's prerequisite of showing an inability "to conceive or produce conception after 1 year of frequent, unprotected heterosexual sexual intercourse, or 6 months of frequent, unprotected heterosexual sexual intercourse if the female partner is 35 years of age or older;" or, "[a]lternately," inability "to conceive or produce conception after at least 12 cycles of donor insemination (6 cycles for women 35 years of age or older)."

162.    Aetna's CPB language—requiring health plan members who, because of their sexual orientation or gender identity, cannot meet Aetna's prerequisite and therefore must pay out of pocket for infertility treatments before Aetna covers such treatments under its health plans—poses an immediate threat to the Plaintiff Classes' rights under Section 1557 of the ACA, Section 296(2)(a) of the NYSHRL, and Section 8-107(4) of the NYCHRL, to be free from discrimination on the basis of sex.

163.    The Plaintiff Classes are so numerous that joinder of all individual members would be impracticable.

164.    The population of New York State is over 20 million.[9] Aetna is the largest provider of "preferred provider organization," or "PPO," plans in New York State, providing 19% of PPO health plans in the state and 24% of PPO health plans in the New York City metro area.[10] Aetna is the second largest provider of any kind of health insurance plan in the New York City metro area, providing 16% of health insurance plans.[11] Approximately 2.7% of the population of New York consists of women between the ages of 18 and 49 who identify as LGBTQ.[12]

165.    Additionally, Aetna provides numerous student health plans in New York that are identical to Plaintiff Emma Goidel's Columbia Policy with regard to infertility treatment. In addition to Columbia University, these include Aetna student health plans for Barnard

---

[9] America Counts Staff, *New York State Population Topped 20 Million in 2020*, U.S. Census Bureau (Aug. 25, 2021), https://www.census.gov/library/stories/state-by-state/new-york-population-change-between-census-decade.html.

[10] *Table A-2*, Am. Med. Ass'n, Competition in Health Insurance: A comprehensive study of U.S. markets 30 (2021), https://www.ama-assn.org/system/files/competition-health-insurance-us-markets.pdf.

[11] *Table A-1, id.* at 19.

[12] Calculations are based on the Behavioral Risk Factor Surveillance System Survey (BRFSS), accessed through Centers for Disease Control and Prevention (CDC). *Behavioral Risk Factor Surveillance System Survey Data.* Atlanta, Georgia: U.S. Department of Health and Human Services, Centers for Disease Control and Prevention**,** 2020.

College,[13] Brooklyn Law School,[14] Cornell University,[15] the Fashion Institute of Technology,[16] Hofstra University,[17] the Icahn School of Medicine,[18] Manhattanville College,[19] New York Film Academy,[20] New York Institute of Technology,[21] New York Medical College,[22] Pratt Institute,[23] Rochester Institute of Technology,[24] Syracuse University,[25] SUNY Maritime,[26] SUNY Purchase,[27] Touro Colleges of Dentistry, Osteopathic Medicine, and Pharmacy,[28] and the

---

[13] Student Health Insurance Policy, Aetna Life Ins. Co. at 44 (eff. Aug. 22, 2020), https://www.aetnastudenthealth.com/schools/barnardcollege/masterpolicy2021.pdf.

[14] Student Health Insurance Policy, Aetna Life Ins. Co. at 37 (eff. Aug. 10, 2020), https://www.aetnastudenthealth.com/schools/bls/masterpolicy2021.pdf.

[15] Certificate of Coverage 2021–2022, Cornell University Student Health Plan at 40 (approved by N.Y. Dep't of Fin. Servs. June 1, 2021), https://www.aetnastudenthealth.com/schools/cornell2/coc2122.pdf; Certificate of Coverage 2021–2022, Cornell University Student Health Plan Plus at 36 (approved by N.Y. Dep't of Fin. Servs. June 1, 2021), https://www.aetnastudenthealth.com/schools/cornell2/cocPLUS2122.pdf (both have identical infertility language and together serve Cornell University, Cornell Tech, and Weill Cornell Medicine students).

[16] Student Health Insurance Policy, Aetna Life Ins. Co. at 39 (eff. Aug. 15, 2020), https://www.aetnastudenthealth.com/schools/fitnyc/masterpolicy2021.pdf.

[17] Student Health Insurance Policy, Aetna Life Ins. Co. at 45 (eff. Aug. 1, 2020), https://www.aetnastudenthealth.com/schools/hofstrauniversity/masterpolicy2021.pdf.

[18] Student Health Insurance Policy, Aetna Life Ins. Co. at 47 (eff. Aug. 1, 2020), https://www.aetnastudenthealth.com/schools/Icahn/masterpolicy2021-0801.pdf.

[19] Student Health Insurance Policy, Aetna Life Ins. Co. at 41 (eff. Aug. 1, 2020), https://www.aetnastudenthealth.com/schools/manhattanville/masterpolicy2021.pdf.

[20] Student Health Insurance Policy, Aetna Life Ins. Co. at 45 (eff. Sept. 15, 2020), https://www.aetnastudenthealth.com/schools/newyorkfilmny/masterpolicy2021.pdf.

[21] Student Health Insurance Policy, Aetna Life Ins. Co. at 42 (eff. Aug. 1, 2020), https://www.aetnastudenthealth.com/schools/nyitdom/masterpolicy2021.pdf.

[22] Student Health Insurance Policy, Aetna Life Ins. Co. at 41 (eff. July 1, 2020), https://www.aetnastudenthealth.com/schools/nymedical/masterpolicy2021.pdf.

[23] Student Health Insurance Policy, Aetna Life Ins. Co. at 44 (eff. Aug. 18, 2020), https://www.aetnastudenthealth.com/schools/pratt/masterpolicy2021.pdf.

[24] Student Health Insurance Policy, Aetna Life Ins. Co. at 39 (eff. Aug. 15, 2020), https://www.aetnastudenthealth.com/schools/rit/masterpolicy2021.pdf.

[25] Student Health Insurance Policy, Aetna Life Ins. Co. at 39 (eff. Aug. 1, 2020), https://www.aetnastudenthealth.com/schools/syracuse/masterpolicy2021.pdf.

[26] Student Health Insurance Policy, Aetna Life Ins. Co. at 42 (eff. Aug. 10, 2020), https://www.aetnastudenthealth.com/schools/sunymaritime/masterpolicy2021.pdf.

[27] Student Health Insurance Policy, Aetna Life Ins. Co. at 46 (eff. Aug. 14, 2020), https://www.aetnastudenthealth.com/schools/purchase/masterpolicy2021.pdf.

[28] Student Health Insurance Policy, Aetna Life Ins. Co. at 40 (eff. July 1, 2020), https://www.aetnastudenthealth.com/schools/dentaltouro/masterpolicy2021.pdf; Student Health Insurance Policy, Aetna Life Ins. Co. at 40 (eff. July 1, 2020), https://www.aetnastudenthealth.com/schools/tourocom/masterpolicy2021.pdf; Student Health Insurance Policy, Aetna Life Ins. Co. at 40 (eff. July 1, 2020), https://www.aetnastudenthealth.com/schools/tcop/masterpolicy2021.pdf.

University of Rochester.[29] Together, these schools enroll over 150,000 students in New York, including over 60,000 professional and graduate school students.

166.    Upon information and belief, Aetna applies its discriminatory policy to all health plans that it provides or administers in New York, irrespective of the type of health plan, so long as such health plans provide coverage for fertility treatment.

167.    Upon information and belief, therefore, thousands of New Yorkers enrolled in Aetna health plans that otherwise provide coverage for fertility treatments are forced to pay out-of-pocket for those fertility treatments based on their sexual orientation or gender identity, because of Aetna's discrimination.

168.    The questions of law and fact presented by Plaintiffs are common to all members of the Plaintiff Classes. Among others, questions common to the Plaintiff Classes include:

a. Whether Aetna's CPB language regarding infertility treatment results in members who, due to their sexual orientation or gender identity, cannot meet Aetna's CPB prerequisite of showing an inability "to conceive or produce conception after 1 year of frequent, unprotected heterosexual sexual intercourse, or 6 months of frequent, unprotected heterosexual sexual intercourse if the female partner is 35 years of age or older;" or, "[a]lternately," inability "to conceive or produce conception after at least 12 cycles of donor insemination (6 cycles for women 35 years of age or older); and

---

[29] Certificate of Coverage 2021–2022, University of Rochester Student Health Insurance Plan at 41–42 (approved by N.Y. Dep't of Fin. Servs. May 18, 2021), https://www.aetnastudenthealth.com/schools/rochester/coc2122.pdf.

b.  Whether this policy constitutes discrimination on the basis of sex, including sexual orientation and/or gender identity.

169.  Common issues of law and fact predominate any individual issues.

170.  All members of the Plaintiff Classes are likely to be subjected to the same practices and policies of Aetna under its CPB and other similar documents.

171.  Plaintiffs' claims for prospective relief are typical of the Plaintiff Class under Rule 23(b)(2). Individuals enrolled in plans provided or administered by Aetna  in New York are likely to continue to seek fertility treatment coverage under Aetna's plans, these individuals are likely to include many individuals who, due to their sexual orientation or gender identity, will not be able to meet Aetna's prerequisite of showing an inability "to conceive or produce conception after 1 year of frequent, unprotected heterosexual sexual intercourse, or 6 months of frequent, unprotected heterosexual sexual intercourse if the female partner is 35 years of age or older;" or, "[a]lternately," inability "to conceive or produce conception after at least 12 cycles of donor insemination (6 cycles for women 35 years of age or older)." Plaintiffs and members of the Plaintiff Class are reasonably fearful that Aetna will continue to subject its members to discrimination on the basis of sex by maintaining its discriminatory policy and applying it across all health plans.

172.  The entire Plaintiff Class under Rule 23(b)(2) will benefit from the injunctive relief sought herein.

173.  Plaintiffs have no conflicts of interest with any members of the Plaintiff Classes, are committed to vigorous prosecution of all claims on behalf of members of the Plaintiff Classes, and will fairly and adequately protect the interests of the Plaintiff Classes.

174.     A class action is superior to any other method for the fair and efficient resolution of this legal dispute, as joinder of all members of the Plaintiff Classes is impracticable. Further, the prosecution of thousands of individual actions by individual members of the Plaintiff Classes would create the substantial risk of inconsistent or varying adjudications, which would establish potentially incompatible standards of conduct for Defendant Aetna.

175.     The Plaintiff Classes are represented by competent counsel experienced in litigating discrimination cases and class action cases.

## FIRST CAUSE OF ACTION
42 U.S.C. § 18116(a)
Discrimination in Health Care on the Basis of Sex

176.   Plaintiffs and the Plaintiff Classes reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

177.   Section 1557 of the ACA prohibits discrimination on the basis of sex, including discrimination on the basis of sexual orientation and gender identity, in any health program or activity that receives federal financial assistance.

178.   Aetna receives federal financial assistance and is a health program or activity, and it is therefore covered by Section 1557 of the ACA.

179.   Aetna discriminates on the basis of sex under Section 1557 by requiring LGBTQ individuals—who cannot conceive through sexual intercourse because of their gender identity or their sexual orientation—to incur substantial costs as a prerequisite to receiving coverage for fertility services.

180.   As a direct result of Defendant's violation of Plaintiffs' and the Plaintiff Classes' rights under Section 1557 of the ACA, Plaintiffs and the Plaintiff Classes have suffered emotional distress and physical and financial injury.

181.   All the acts and omissions committed by Defendant described herein for which liability is claimed were done intentionally, unlawfully maliciously, wantonly, recklessly, negligently, and/or with bad faith and said acts meet all of the standards for imposition of punitive damages.

182.   Accordingly, Plaintiffs and Plaintiff Class under Rule 23(b)(3) are entitled to compensatory and punitive damages, as well as reasonable attorneys' fees, costs, and disbursements.

183.     Plaintiffs and Plaintiff Class under Rule 23(b)(2) are entitled to injunctive and declaratory relief; as well as reasonable attorneys' fees, costs, and disbursements.

## SECOND CAUSE OF ACTION
N.Y. Exec. Law § 296(2)(a)
Discrimination on the Basis of Sex in Violation of NYSHRL

184.     Plaintiff Emma Goidel and the Plaintiff Classes reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

185.     The NYSHRL prohibits discrimination on the basis of sex, sexual orientation, and gender identity or expression by any place of public accommodation.

186.     Aetna and Columbia University are both places of public accommodation within the meaning of NYSHRL, § 296(2)(a).

187.     Aetna discriminates on the basis of sex under the NYSHRL by requiring LGBTQ individuals who cannot conceive through sexual intercourse because of their gender identity or their sexual orientation to incur substantial costs as a prerequisite to receiving coverage for fertility services.

188.     As a direct result of Defendant's violation of Plaintiff's and the Plaintiff Classes' rights under the NYSHRL, Plaintiff and members of the Plaintiff Class have suffered emotional distress and physical and financial injury.

189.     All the acts and omissions committed by Defendant described herein for which liability is claimed were done intentionally, unlawfully maliciously, wantonly, recklessly, negligently, and/or with bad faith and said acts meet all of the standards for imposition of punitive damages.

190.    Accordingly, Plaintiff and Plaintiff Class under Rule 23(b)(3) are entitled to compensatory and punitive damages, as well as reasonable attorneys' fees, costs, and disbursements.

191.    Plaintiff and Plaintiff Class under Rule 23(b)(2) are entitled to injunctive and declaratory relief; as well as reasonable attorneys' fees, costs, and disbursements.

### THIRD CAUSE OF ACTION
N.Y.C. Admin. Code § 8-107(4)
Discrimination on the Basis of Sex in Violation of NYCHRL

192.    Plaintiff Emma Goidel and Plaintiff Classes reallege as if fully set forth herein the allegations contained in the preceding paragraphs.

193.    The NYCHRL prohibits discrimination on the basis of gender or sexual orientation by any place or provider of public accommodation.

194.    Aetna and Columbia University are both places or providers of public accommodation within the meaning of NYCHRL, §§ 8-102 and 8-107(4).

195.    Aetna discriminates on the basis of sex under the NYCHRL by requiring LGBTQ individuals who cannot conceive through sexual intercourse because of their gender identity or their sexual orientation to incur substantial costs as a prerequisite to receiving coverage for fertility services.

196.    As a direct result of Defendant's violation of Plaintiff's and the Plaintiff Classes' rights under the NYCHRL, Plaintiff and members of the Plaintiff Class have suffered emotional distress and physical and financial injury.

197.    All the acts and omissions committed by Defendant described herein for which liability is claimed were done intentionally, unlawfully maliciously, wantonly, recklessly,

31

negligently, and/or with bad faith and said acts meet all of the standards for imposition of punitive damages.

198.    Accordingly, Plaintiff and Plaintiff Class under Rule 23(b)(3) are entitled to compensatory and punitive damages, as well as reasonable attorneys' fees, costs, and disbursements.

199.    Plaintiff and Plaintiff Class under Rule 23(b)(2) are entitled to injunctive and declaratory relief; as well as reasonable attorneys' fees, costs, and disbursements.

## JURY TRIAL DEMANDED

200.    Plaintiffs demand a trial by jury.

**WHEREFORE,** Plaintiffs respectfully requests judgment against Defendant as follows:

 a. Declaring that Defendant violated Plaintiffs' and Plaintiff Classes' rights under Section 1557 of the ACA, the NYSHRL, and the NYCHRL, by virtue of its discriminatory policy on coverage for infertility treatments, and that Defendant is likely to continue to cause ongoing violations of Plaintiffs' and Plaintiffs Classes' rights;

 b. Permanently enjoining Defendant from implementing and enforcing its discriminatory CPB and all other similar Aetna policies to deny infertility treatment coverage to individuals who cannot conceive through sexual intercourse because of their gender identity or their sexual orientation;

 c. Awarding compensatory damages in an amount to be determined at trial;

 d. Awarding punitive damages in an amount to be determined at trial;

 e. Awarding reasonable attorneys' fees, costs, and disbursements; and

 f. Awarding such other and further relief as this Court deems just and equitable.

Dated: New York, New York
          November 4, 2021


By: _____/s/_____
          EMERY CELLI BRINCKERHOFF
          ABADY WARD & MAAZEL LLP
          Zoe Salzman
          Debra Greenberger
          Noel R. León
          Francesca Cocuzza
          600 Fifth Avenue, 10th Floor
          New York, New York 10020
          (212) 763-5000


          NATIONAL WOMEN'S LAW
          CENTER
          Sunu Chandy
          Michelle Banker
          Alison Tanner
          11 Dupont Circle NW, Suite 800
          Washington, DC 20036
          (202) 588-5180

          *Attorneys for Plaintiffs*