UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EMMA GOIDEL, ILANA LEE, MADELEINE
LEE, And LESLEY BROWN, on behalf of
themselves and all others similarly situated,

*Plaintiffs*,

- against -

AETNA LIFE INSURANCE COMPANY,

*Defendant.*

Case No. 1:21-cv-07619 (VSB)

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFFS' MOTION
FOR PRELIMINARY APPROVAL OF SETTLEMENT**

TABLE OF CONTENTS

PAGE NO(s)

TABLE OF CONTENTS............................................................................................ i

TABLE OF AUTHORITIES ..........................................................................iii-vi

INTRODUCTION ................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND.......................................... 3

    I.      Factual Background ......................................................................... 3

    II.     Complaint and Answer ................................................................... 5

    III.    Discovery and Information Exchange ............................................ 7

    IV.    Negotiation of the Settlement ........................................................ 8

SUMMARY OF THE SETTLEMENT TERMS ...................................................... 11

    I.      Overview...................................................................................... 11

    II.     The Settlement Classes ............................................................... 12

    III.    Injunctive Relief for the Settlement Class ................................. 13

    IV.    Monetary Relief for the Settlement Class ................................. 15

         A.    Award Amounts .............................................................. 15

         B.    Eligibility ....................................................................... 17

         C.    Releases........................................................................... 19

    V.     Administrative Costs, Service Awards, and Attorneys' Fees and Costs ............. 19

         A.    Administrative Costs....................................................... 19

         B.    Service Awards ............................................................... 21

         C.    Attorneys' Fees and Costs .............................................. 21

PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE .......... 22

    I.      Adequacy of Representation ....................................................... 23

    II.     Arm's Length Negotiations.......................................................... 25

i

III.    Adequacy of Relief ................................................................................... 27

    A.    Costs, Risk, and Delay of Trial and Appeal.................................... 27

    B.    Effectiveness of the Proposed Method of Distributing Relief................. 29

    C.    The Terms of Any Proposed Award of Attorneys' Fees and Expenses ... 32

    D.    Any Agreement Required to Be Identified Under Rule 23(e)(3) ............ 33

    E.    Equitable Treatment of Class Members.................................................... 33

    F.    Other Grinnell Adequacy Factors ............................................................. 36

CERTIFICATION OF THE RULE 23 SETTLEMENT CLASS IS APPROPRIATE ............... 40

I.    Rule 23(a) is Satisfied........................................................................... 40

II.    Rule 23(b)(3) is Satisfied ..................................................................... 42

THE NOTICE PLAN AND DISTRIBUTION PROCESS ARE APPROPRIATE..................... 44

I.    Individualized Notice........................................................................... 45

II.    Publication Notice and Paid Media Notice ........................................... 46

III.    Form and Content of Notices, Settlement Website, Claim Submission, and Class Member Questions ................................................................. 47

CONCLUSION................................................................................................... 49

TABLE OF AUTHORITIES

PAGE NO(s)

**Cases**

*Amchem Prods., Inc. v. Windsor*,
    521 U.S. 591 (1997) ................................................................................................ 44

*Berton v. Aetna Inc. et al*,
    No. 23 Civ. 01849 (N.D. Cal.) ............................................................................... 43

*Betances v. Fischer*,
    304 F.R.D. 416 (S.D.N.Y. 2015) ............................................................................ 25

*Borders v. Walmart Stores, Inc.*,
    No. 17 Civ. 506, 2020 WL 13190099 (S.D. Ill. 2020) ........................................... 25

*Brown v. Kelly*,
    244 F.R.D. 222 (S.D.N.Y. 2007) ............................................................................ 25

*Parker v. City of New York*,
    No. 15 Civ. 6733, 2017 WL 6375736 (E.D.N.Y. Dec. 11, 2017) ........................... 37

*City of Detroit v. Grinnell Corp.*,
    495 F.2d 448 (2d Cir. 1974) ........................................................................... passim

*Communities for Equity v. Mich. High Sch. Athletics Ass'n*,
    192 F.R.D. 583 (W.D. Mich. 1999) ....................................................................... 25

*Consol. Rail Corp. v. Town of Hyde Park*,
    47 F.3d 473 (2d Cir. 1995) ..................................................................................... 40

*Cordes & Co. Fin. Servs., Inc. v. AG. Edwards & Sons, Inc.*,
    502 F.3d 91 (2d Cir. 2007) ..................................................................................... 23

*County of Suffolk v. Long Island Lighting Co.*,
    710 F. Supp. 1422 (E.D.N.Y. 1989) ...................................................................... 44

*D'Amato v. Deutsche Bank*,
    236 F.3d 78 (2d Cir. 2001) ......................................................................... 25, 26, 27

*Denney v. Deutsche Bank AG*,
    443 F.3d 253 (2d Cir. 2006) ................................................................................... 24

*Diaz v. E. Locating Serv., Inc.*,
    No. 10 Civ. 4082, 2010 WL 5507912
    (S.D.N.Y. Nov. 29, 2010) ....................................................................................... 22

*Frank v. Eastman Kodak Co.*,
    228 F.R.D. 174 (W.D.N.Y. 2005)..........................................................................38, 39, 40

*George v. Shamrock Saloon II, LLC*,
    No. 17 Civ. 6663, 2021 WL 3188314 (S.D.N.Y. July 28, 2021) ....................................48

*Gordon v. Vanda Pharms. Inc.*,
    No. 19 Civ. 1108, 2022 WL 4296092
    (E.D.N.Y. Sept. 15, 2022)...........................................................................................23, 27

*Hall v. Children's Place Retail Stores, Inc.*,
    669 F. Supp. 2d 399 (S.D.N.Y. 2009)..............................................................................39

*Hernandez v. Merrill Lynch & Co., Inc.*,
    No. 11 Civ. 8472, 2012 WL 5862749 (S.D.N.Y. Nov. 15, 2012) ....................................22

*In re Advanced Battery Techs., Inc. Sec. Litig.*,
    298 F.R.D. 171 (S.D.N.Y. 2014)......................................................................................30

*In re Am. Int'l Grp., Inc. Sec. Litig.*,
    689 F.3d 229 (2d Cir. 2012)..............................................................................................44

*In re Austrian & German Bank Holocaust Litig.*,
    80 F. Supp. 2d 164 (S.D.N.Y. 2000)................................................................................27

*In re Crazy Eddie Secs. Litig.*,
    824 F. Supp. 320 (E.D.N.Y. 1993) ..................................................................................39

*In re GSE Bonds Antitrust Litig.*,
    414 F. Supp. 3d 686 (S.D.N.Y. 2019)......................................................................passim

*In re Initial Pub. Offering Secs. Litig.*,
    671 F. Supp. 2d 467 (S.D.N.Y. 2009)..............................................................................39

*In re Michael Milken & Assocs. Sec. Litig.*,
    150 F.R.D. 57 (S.D.N.Y. 1993) .......................................................................................48

*In re PaineWebber Ltd. P'ships Litig.*,
    171 F.R.D. 104 (S.D.N.Y. 1997) .....................................................................................29

*In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*,
    330 F.R.D. 11 (E.D.N.Y. 2019) ................................................................................30, 38

*In re Petrobras*,
    862 F.3d 250 (2d Cir. 2017)..............................................................................................42

*In re U.S. FoodServ. Inc. Pricing Litig.*,
    729 F.3d 108 (2d Cir. 2013)..............................................................................................43

*In re Warfarin Sodium Antitrust Litig.*,
　　391 F.3d 516 (3d Cir. 2004)..............................................................22

*In re WorldCom, Inc. Sec. Litig.*,
　　388 F. Supp. 2d 319 (S.D.N.Y. 2005)..............................................30

*Johnson v. Nextel Comms. Inc.*,
　　780 F.3d 128 (2d Cir. 2015)..............................................................41

*Kulwicki v. Aetna Life Ins. Co.*,
　　No. 22 Civ. 00229 (D. Conn.)...........................................................43

*Kurtz v. Kimberly-Clark Corp.*,
　　No. 14 Civ. 1142 & 15 Civ. 2910, 2024 WL 184375
　　(E.D.N.Y. Jan. 17, 2024) ..................................................................35

*Lea v. Tal Educ. Grp.*,
　　No. 18 Civ. 5480, 2021 WL 5578665 (S.D.N.Y. Nov. 30, 2021) .......26, 28, 31

*Matheson v. T-Bone Rest., LLC*,
　　No. 09 Civ. 4214, 2011 WL 6268216 (S.D.N.Y. Dec. 13, 2011)....................38

*McMahon v. Olivier Cheng Catering & Events, LLC*,
　　No. 08 Civ. 8713, 2010 WL 2399328 (S.D.N.Y. Mar. 3, 2010) ....................37

*Mikhlin v. Oasmia Pharm. AB*,
　　No. 19 Civ. 4349, 2021 WL 1259559 (E.D.N.Y. Jan. 6, 2021 ......................23

*Moses v. N.Y. Times Co.*,
　　79 F.4th 235 (2d Cir. 2023) ...............................................32, 35, 36

*Nichols v. Noom, Inc.*,
　　No. 20 Civ. 3677, 2022 WL 2705354 (S.D.N.Y. July 12, 2022) ....................41

*Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*,
　　277 F.R.D. 97 (S.D.N.Y. 2011) .........................................................43

*Reyes v. Summit Health Mgmt., LLC*,
　　No. 22 Civ. 9916, 2024 WL 472841 (S.D.N.Y. Feb. 6, 2024) ................passim

*Roach v. T.L. Cannon Corp.*,
　　778 F.3d 401 (2d Cir. 2015)..............................................................42

*Rosenfeld v. Lenich*,
　　No. 18 Civ. 6720, 2021 WL 508339 (E.D.N.Y. Feb. 11, 2021)...............passim

*Shahriar v. Smith & Wollensky Rest. Grp., Inc.*,
　　659 F.3d 234 (2d Cir. 2011)..............................................................41

*Sow v. City of New York*,
    No. 21 Civ. 00533, 2024 WL 964595 (S.D.N.Y. Mar. 5, 2024) ...................................... 32

*Sykes v. Mel S. Harris & Assocs. LLC*,
    780 F.3d 70 (2d Cir. 2015) ................................................................................ 42

*Velez v. Majik Cleaning Serv., Inc.*,
    No. 03 Civ. 8698, 2007 WL 7232783
    (S.D.N.Y. June 25, 2007) ................................................................................. 29

*Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*,
    396 F.3d 96 (2d Cir. 2005) ................................................................... 22, 25, 38

*Wise v. Kelly*,
    620 F. Supp. 2d 435 (S.D.N.Y. 2008) .............................................................. 25

**Statutes**

20 U.S.C. § 1681 ................................................................................................ 19

42 U.S.C. § 18116(a) ..................................................................................... 5, 19

42 U.S.C. § 2000e .............................................................................................. 19

Employee Retirement Income Security Act of 1974 ........................................... 7

N.Y. Exec. Law § 296(2)(a) ..................................................................... 5, 6, 7, 19

N.Y.C. Admin. Code § 8-102 ................................................................................ 6

N.Y.C. Admin. Code § 8-107(4) ............................................................... 5, 6, 7, 19

Patient Protection Affordable Care Act of 2010 ............................................... 6, 7

**Other Authorities**

American Society for Reproductive Medicine, "Definitions of infertility:
    a committee opinion," Practice Committee of the American Society
    for Reproductive Medicine (Dec. 1, 2023) ..................................................... 13

Newberg § 13:3 .................................................................................................. 44

**Rules**

Fed. R. Civ. P. 23 ....................................................................................... passim

## INTRODUCTION

Subject to Court approval, Plaintiffs Emma Goidel, Ilana Lee, Madeleine Lee, and Lesley Brown ("Class Representatives" or "Named Plaintiffs"), individually and on behalf of the class they seek to represent (collectively, the "Plaintiffs"), and Defendant Aetna Life Insurance Company ("Defendant" or "Aetna") (together, the "Parties") have settled this class action lawsuit. This case alleged that Aetna discriminated against LGBTQ+ people by requiring them to pay out-of-pocket for 6 or 12 rounds of artificial insemination ("IUI") before they qualified for health insurance for fertility treatments. By contrast, heterosexual couples were immediately eligible for insurance coverage just by representing they could not conceive, without having to do IUI.

The settlement includes ground-breaking injunctive relief. First, Aetna has agreed to change its definition of "infertility." At the time this case was filed, Aetna required LGBTQ+ individuals to pay out-of-pocket to undergo 6 or 12 cycles of IUI, depending on the individual's age, in order to establish they were "infertile" and qualify for coverage of fertility services ("Definition of Infertility").[1] Now, Aetna has agreed to revise the Definition of Infertility in Aetna's Clinical Policy Bulletin No. 327 ("CPB 327"), such that individuals with a uterus in an Eligible LGBTQ+ Relationships[2] qualify as "infertile" without having to do, or pay for, any IUI cycles. Second, Aetna has created a new policy making IUI a standard medical benefit for all members regardless of sexual orientation. Third, Aetna has changed its policy so that individuals in an Eligible LGBTQ+ Relationship will not be required to undergo any greater number of IUI

---

[1] Aetna altered the Definition of Infertility post-filing, on October 25, 2023, to require individuals without a sperm-producing partner to pay out-of-pocket to undergo 3 or 6 cycles of IUI instead of 6 or 12.

[2] An "Eligible LGBTQ+ Relationship," as used throughout this memorandum and within the Settlement Agreement, is a relationship consisting of two individuals who self-identify as "LGBTQ+," where at least one of whom has a uterus and whose partner was incapable of producing sperm due to having been assigned the female sex at birth, being intersex, or being assigned the male sex at birth and having transitioned or having been in the process of transitioning to the opposite gender. All defined terms have the same meaning as they do in the Settlement Agreement. Salzman Decl., Ex. 1.

cycles to qualify for in vitro fertilization ("IVF") coverage.

The settlement also includes significant monetary compensation. All Class Members are entitled to a default payment of approximately $10,000 (the "Default Common Fund Amount"), paid out of a common fund of $2,000,000 (the "Common Fund") funded by Aetna. Class Members can also submit claims for miscellaneous harms and additional out-of-pocket expenses and may be eligible to receive additional compensation, to the extent money remains in the Common Fund. In addition, Class Members are also eligible to have their claims reprocessed by Aetna and to receive a default payment of $2,300 (the "Default Dollars for Benefits Amount"), as well as the opportunity to receive higher compensation for greater covered care, up to the limit of their plan's coverage. Separate from and in addition to the Common Fund and Dollars for Benefits, Aetna will also pay for the costs of the settlement administrator and Special Master and (subject to Court approval) Class Representative service awards and Class Counsel's attorneys' fees and costs.

Because the proposed settlement satisfies the criteria for preliminary approval, Plaintiffs respectfully request that the Court:

(i)    Grant preliminary approval of the settlement agreement between the Parties dated April 18, 2024 (the "Settlement Agreement"), Ex. 1 to the Declaration of Zoe Salzman ("Salzman Decl.")[3];

(ii)    Preliminarily certify the settlement class (the "Settlement Class") and appoint Emery Celli Brinckerhoff Abady Ward & Maazel LLP ("ECBAWM") and the National Women's Law Center ("NWLC") as class counsel for the Settlement Class ("Class Counsel");

---

[3] All exhibits identified by number are attached to the Declaration of Zoe Salzman, dated May 3, 2024, filed in support of this motion. All exhibits identified by letter are attached to the Declaration of Bryn Bridley, dated May 3, 2024, filed in support of this motion.

(iii)   Approve Atticus Administration LLC as the settlement administrator (the "Administrator");

(iv)   Approve the form, content, and manner of notice to the Settlement Class and authorize notice to be distributed in the manner described in the Declaration of Bryn Bridley ("Bridley Decl."), as well as the proposed notices to Class Members and the proposed Claim Form Package, *see* Bridley Decl. Exs. B-F; and

(v)   Order Defendant to pay the costs of notice and administration to the Administrator pursuant to the terms and conditions set forth in the Settlement Agreement.

Pursuant to the terms of the Settlement Agreement, Defendant will not oppose Plaintiffs' motion because it conforms to the terms of the Agreement.

A proposed order (approved by both Plaintiffs and Defendant) granting preliminary approval is attached as Exhibit 2 to the Salzman Declaration.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.   Factual Background

The facts of this case, initially filed in September 2021, are well documented in various Court submissions. Plaintiffs are a class of individuals who want to have children but cannot conceive through sexual intercourse with their partners, and rather can become pregnant only with medical assistance, such as fertility treatments like intrauterine insemination ("IUI") and in vitro fertilization ("IVF"). Plaintiffs alleged that Defendant issued, designed, marketed, and administered health benefits plans containing a discriminatory Definition of Infertility that, on its face, denied LGBTQ+ (lesbian, gay, bisexual, transgender, queer, intersex, or non-binary) individuals equal access to their health benefits based on sex, in violation of federal law and New

3

York state and city law.

The Named Plaintiffs and Class Representatives in this class action are Emma Goidel, Ilana Lee, Madeleine Lee, and Lesley Brown. The Defendant is Aetna Life Insurance Company. The proposed Injunctive Settlement Class is defined as all individuals in an Eligible LGBTQ+ Relationship, who are currently covered by a Commercial Plan provided or administered by Aetna in New York, and who currently or will in the future want to obtain coverage for IUI or IVF treatments. Ex. 1 ¶ 55.

The proposed Damages Settlement Class is comprised of individuals who establish their eligibility in one of the following three ways and who do not opt-out of the class (collectively, the "Class Members"):

    (a)    "Category A Class Members" consists of a group of 67 people identified to date through discovery who the Parties agree sought and were denied coverage due to the Definition of Infertility and who were in an Eligible LGBTQ+ Relationship during the Class Period[4];

    (b)    "Category B Class Members" consists of a group of people who the Parties agree sought and were denied coverage due to the Definition of Infertility during the Class Period, and who submit an attestation certifying that, at the time they sought coverage, they were in an Eligible LGBTQ+ Relationship (the "Attestation"); and

    (c)    "Category C Class Members" is defined as individuals who submit the Attestation, were members of a New York Aetna plan during the Class Period, incurred out-of-pocket expenses for artificial insemination services

---

[4] The class period is defined as September 1, 2017, through May 31, 2024 ("Class Period").

received that would have been covered by their Aetna plan, and either:

(1)    never sought coverage for any fertility services from Aetna during the Class Period; or

(2)    never sought coverage for IUI or other donor insemination from Aetna during the Class Period, but sought and received approval for IVF, or were denied coverage for IVF due to the Definition of Infertility.

*Id.* ¶ 65. All individuals who establish their eligibility through Categories A, B, or C will be Class Members and will be equally entitled to relief under the Settlement Agreement.

The "Class Period" is defined as the period between September 1, 2017 and May 31, 2024, as Aetna will begin rolling out implementation of the injunctive relief agreed to in the Settlement Agreement on June 1, 2024. *Id.* ¶ 57.

## II.   Complaint and Answer

On September 13, 2021, Named Plaintiff Emma Goidel filed a Complaint on behalf of herself and others similarly situation against Aetna Inc., alleging discrimination in health care on the basis of sex in violation of 42 U.S.C. § 18116(a) and discrimination on the basis of sex, sexual orientation, and gender identity or expression by any place of public accommodation in violation of N.Y. Exec. Law § 296(2)(a) and N.Y.C. Admin. Code § 8-107(4). ECF No. 1. On November 5, 2021, Plaintiffs filed a First Amended Complaint, adding Ilana Lee, Madeleine Lee, and Lesley Brown as Named Plaintiffs. ECF No. 20. Named Plaintiffs sought to represent a class of individuals who were (a) individuals in LGBTQ+ relationships; (b) enrolled in Aetna insurance plans in New York; and (c) denied coverage for fertility treatments and forced to pay out of pocket to obtain those treatments. *Id.* ¶¶ 3–4, 7–8.

The Named Plaintiffs sought injunctive relief and monetary damages along with all other members of the putative class. As alleged in the Amended Complaint, Section 1557 of the Patient Protection Affordable Care Act ("ACA") prohibits discrimination on the basis of sex, including discrimination on the basis of sexual orientation and gender identity, in any health program or activity any part of which receives federal financial assistance. *Id.* ¶ 177. Aetna receives federal financial assistance and is a health program or activity, and it is therefore covered by Section 1557 of the ACA. *Id.* ¶ 178. Section 296(2)(a) of the New York State Human Rights Law ("NYSHRL") prohibits discrimination on the basis of sex, sexual orientation, and gender identity or expression by any place of public accommodation. *Id.* ¶ 185. Section 8-107(4) of the New York City Human Rights Law ("NYCHRL") prohibits discrimination on the basis of gender or sexual orientation by any place or provider of public accommodation. *Id.* ¶ 193. Aetna is a place or provider of public accommodation within the meaning of the NYSHRL, § 296(2)(a), and the NYCHRL, §§ 8-102 and 8-107(4). *Id.* ¶¶ 186, 194.

Aetna interprets all of Plaintiffs' plans by reference to its own internal policy documents, including CPB 327, which, at the time this case was filed, provided that infertility treatment was covered under Plaintiffs' plans without any out-of-pocket cost to individuals based on their representation that they have not gotten pregnant after having unprotected heterosexual sexual intercourse over the course of 6 or 12 months, depending on their age. *Id.* ¶ 5. However, CPB 327 required individuals who could not conceive through heterosexual sexual intercourse due to their sexual orientation or gender identity to pay out-of-pocket for 6 or 12 cycles of IUI before Aetna would provide them with coverage for fertility treatments. *Id.* ¶ 6. Aetna relied on this discriminatory policy to deny coverage for each Plaintiff who sought fertility treatments. *Id.* ¶ 7. The Amended Complaint alleged that Aetna's CPB 327's language discriminated against Plaintiffs

and other LGBTQ+ individuals based on their sexual orientation and gender identity and violates their rights under Section 1557 of the ACA, Section 296(2)(a) of the NYSHRL, and Section 8-107(4) of the NYCHRL. *Id.* ¶ 9.

Defendant filed an Answer to Plaintiffs' Amended Complaint on January 21, 2022, denying the majority of Plaintiffs' allegations in the Amended Complaint. ECF No. 26. Defendant claimed that Aetna Inc. does not provide insurance coverage and the proper Defendant to this action should be Aetna Life Insurance Company or related entities that provide health insurance coverage in the State of New York. *Id.* ¶ 2. Defendant denied that CPB 327 discriminated against the Plaintiffs and other LGBTQ+ individuals based on their sex, sexual orientation, and gender identity in violation of federal, state, and city law. *Id.* ¶ 9. In its defense, Defendant asserted that Plaintiffs failed to state a claim upon which relief can be granted; Plaintiffs lacked standing to bring any cause of action; Defendant is not subject to Section 1557 of the ACA; and Plaintiffs' remedies for any alleged act or omission are subject to the terms of their plans and limited solely to those offered by the Employee Retirement Income Security Act of 1974 ("ERISA"). *Id.* ¶ 22.

## III.   Discovery and Information Exchange

Before filing the action, Class Counsel thoroughly investigated the underlying claims and collected significant factual information through pre-suit research and data gathering from individuals who had been denied healthcare coverage for infertility benefits under their Aetna health benefits plans. Emma Goidel, Ilana Lee, Madeleine Lee, and Lesley Brown provided Class Counsel with substantial information and documentation about their experiences with Defendant and their attempts to obtain coverage for infertility treatments under the terms of their Aetna insurance plans. Salzman Decl. ¶ 8.

During discovery, Class Counsel diligently pursued all information relevant to establishing Plaintiffs' claims, propounding numerous rounds of discovery requests and reviewing tens of

thousands of pages of documents Defendant produced (in total, Defendant produced approximately 77,400 pages of documents). *Id.* ¶ 12. Class Counsel's discovery requests sought relevant policies, practices, and directives of Aetna; electronic and hard copy data maintained by Aetna regarding the design and implementation of CPB 327; staff training materials related to coverage for infertility treatment; electronic communications between Aetna personnel regarding design and implementation of CPB 327; and information about and examples of the denial or approval of infertility benefits for LGBTQ+ individuals. *Id.* Class Counsel went through numerous rounds of meet and confers with Aetna's counsel in order to identify the types of data that could lead to the identification of class members, including through numerous searches of multiple different databases, which involved several rounds of exchanging and negotiating search terms and parameters. *Id.*

Class Counsel consulted with various experts and consultants, including experts on infertility treatments and insurance industry data, in order to determine the appropriate injunctive relief for Injunctive Settlement Class Members and the best method of identification and compensation for Damages Settlement Class Members. *Id.* ¶ 13.

The Parties also engaged in extensive meet-and-confers regarding discovery in this case and sought the Court's intervention when the Parties could not reach agreement on discovery matters. *Id.* ¶ 14. After settlement negotiations began to intensify, the Parties filed several letters requesting stays of all Case Management Plan deadlines to focus on the ongoing settlement discussions. *Id.*

## IV.    Negotiation of the Settlement

While the Parties had preliminary settlement conversations for some time, those conversations picked up in earnest in May 2023. *Id.* ¶ 15. At that point, the Parties identified a settlement framework and agreed to pause further fact discovery, except as it related to discovering

the individuals who may be considered Category A, B, and C Class Members. *Id.*

Class Counsel conducted significant data analysis for the purpose of settlement negotiations. *Id.* ¶ 16. For example, Class Counsel estimated, in conjunction with opposing counsel, the number of individuals in Eligible LGBTQ+ Relationships within Aetna's records who may have sought, been approved for (after incurring out-of-pocket expenses), or been denied coverage for artificial insemination or IVF within the Class Period; assessed the individual damages incurred by each Named Plaintiff and the likely average damages incurred by Class Members; analyzed expert medical research studies; analyzed and researched the relevant insurance codes associated with the fertility procedures at issue; and consulted with industry experts, physicians, and medical personnel with firsthand knowledge of the fertility treatment process. *Id.*

The Parties had multiple in-person negotiation sessions and video conferences amongst themselves between May and September 2023 regarding the terms of the Settlement Agreement. *Id.* ¶ 17.

After extensive discussion about the proposed scope and size of the class and the structure of any settlement, the Parties agreed in principle as to the structure of Category A, B, and C Class Members; the Default Dollars for Benefits Amount of $2,300; a common fund to pay the Default Common Fund Amount and other damages; and that any settlement-related costs, including administration, notice, class representative service awards, and attorneys' fees and costs, would be paid by the Defendant, separate from and in addition to the Common Fund and Dollars for Benefits. *Id.* ¶ 18.

In light of the complexity and size of this settlement, the Parties first negotiated a term sheet with these essential terms before moving on to the details of a comprehensive settlement

agreement. *Id*. ¶ 19. The Parties agreed on the scope of the Category A Class Members, and Defendant agreed to coordinate with Class Counsel to determine the best way to identify Category B Class Members within Aetna's system and to ensure potential Category C Class Members receive proper notice of the settlement. *Id*.

The Parties negotiated the manner, extent, and nature of notice to potential Class Members extensively. *Id*. ¶ 20. Specifically, it was imperative to Plaintiffs that the settlement administration and notice regime ensure that they could identify and reach as many Class Members as possible, including those who may not be identified in Aetna's system as having sought infertility treatment because they understood their plan would not cover the IUI cycles necessary to meet the CPB's prerequisite definition of infertility. *Id*. Class Counsel learned from discussions with LGBTQ+ individuals seeking infertility treatments, as well as from discussions with providers of infertility treatments, that insurance plans adhering to a discriminatory definition of infertility—like the Aetna plans at issue—may create a chilling effect on those seeking infertility care, resulting in some patients being dissuaded from filing claims. *Id*. Class Counsel was concerned that notice should reach as many of these potential Class Members as feasible. *Id*. In addition to providing a direct mailing to potential Class Members identified in Aetna's system, the Parties agreed to issue a publication notice via an agreed-upon set of publications and social media sites. *Id*. Defendant also agreed to publish the Summary Notice on its website. *Id*.

On September 22, 2023, the Parties informed the Court that a settlement term sheet had been signed, and the Parties would begin the preparation of a settlement agreement and a motion for preliminary approval. *Id*. ¶ 21. At that time, an agreement on the amount Defendant would deposit into the Common Fund, as well as several other material terms, had not yet been reached. *Id*.

From November 2023 to April 2024, the Parties exchanged multiple drafts of the settlement agreement and engaged in multiple in-person and video meetings to negotiate the outstanding terms. *Id*. ¶ 22. On December 5, 2023, the Honorable Steven M. Gold (retired) mediated a settlement conference with the Parties to assist in resolving the open terms of the settlement agreement. *Id*. ¶ 23. The Parties reached agreement that Defendant would deposit $2,000,000 into the Common Fund and continued to negotiate regarding outstanding open terms over the next few months. *Id*. ¶¶ 23-24.

On February 21, 2024, the Parties held a meeting with Judge Gold, who agreed to serve as the Special Master to assist in issuing compensation from the Common Fund. *Id*. ¶ 26. On March 20, 2024, the Parties held another meeting with Judge Gold, who reviewed, gave input on, and ultimately approved the Allocation Plan to administer the Common Fund. *Id*.

The Parties ultimately reached an agreement on all terms of a settlement agreement, which was executed on April 18, 2024. Ex. 1.

## SUMMARY OF THE SETTLEMENT TERMS

### I.    Overview

As detailed further below, pursuant to the Settlement Agreement, Defendant has agreed to pay a Dollars for Benefits Amount of at least $2,300 to each Class Member whose claims have not already been reimbursed and to fund a Common Fund equal to $2,000,000, with the understanding that a Default Common Fund Amount of approximately $10,000 will be paid to each eligible Class Member. *Id*. ¶¶ 23, 29, 66(b), 67(a); Appendix B ¶ 5 (Allocation Plan). In the event that $2,000,000 is insufficient to fund payments of the Default Common Fund Amount to all eligible Class Members—*i.e.*, if there are over 200 Class Members—the Class Members will receive equal pro-rata payments of the Default Common Fund Amount. Ex. 1, Appendix B ¶ 6 (Allocation Plan). Defendant has also agreed to implement Plaintiffs' requested injunctive relief. Ex. 1 ¶¶ 57–63.

Class Members' awards will be paid after the Court provides final approval of the Settlement Agreement and that final approval order becomes "final" (*i.e.*, the date of the final approval order if no objector has lodged a timely objection, or after all appeals by an objector have been resolved, if any). *Id.* ¶ 32.

## II.     The Settlement Classes

Pursuant to the Settlement Agreement, the Parties have agreed to seek the preliminary certification, pursuant to Fed. R. Civ. P. 23(b)(2), of the following injunctive settlement class (the "Injunctive Settlement Class"): all individuals in an Eligible LGBTQ+ Relationship, who are currently covered by a Commercial Plan provided or administered by Aetna in New York, and who currently or will in the future want to obtain coverage for IUI or IVF treatments. *Id.* ¶ 55.

The Parties have also agreed to seek the preliminary certification, pursuant to Fed. R. Civ. P. 23(b)(3), of the following damages settlement class (the "Damages Settlement Class"), made up of Class Members who establish their eligibility in one of the following three ways:

(a)     Category A Class Members, comprising the people identified through discovery (67 individuals to date) and who the Parties agree sought and were denied coverage due to the Definition of Infertility and who were in an Eligible LGBTQ+ Relationship during the Class Period;

(b)     Category B Class Members, comprising the individuals who the Parties agree sought and were denied coverage due to the Definition of Infertility during the Class Period, and who submit an attestation certifying that at the time they sought coverage, they were in an Eligible LGBTQ+ Relationship (the "Attestation"); and

(c)     Category C Class Members, comprising individuals who submit an Attestation, were members of a New York Aetna plan during the Class

Period, incurred out-of-pocket expenses for artificial insemination services received that would have been covered by their Aetna plan, and either:

(1)     never sought coverage for any fertility services from Aetna during the Class Period, or

(2)     never sought coverage for IUI or other donor insemination from Aetna during the Class Period, but sought and received approval for IVF, or were denied coverage for IVF due to the Definition of Infertility.

*Id.* ¶¶ 27, 65.

## III.     Injunctive Relief for the Settlement Class

The Settlement Agreement is structured to include injunctive relief for the Injunctive Settlement Class so that no current or future Aetna health benefits plan member who is in an Eligible LGBTQ+ Relationship will be denied equal access infertility benefits due to a discriminatory Definition of Infertility. To this end, Aetna will revise its CPB 327 to substantially conform the definition of "Infertility" to the definition published by the American Society for Reproductive Medicine ("ASRM") in 2023,[5] such that the criteria for determining whether a person is considered infertile include the need for medical intervention in order to achieve a successful pregnancy, including the use of donor gametes, which will allow individuals with a uterus in an Eligible LGBTQ+ Relationship to qualify as "infertile" without the need to undergo any cycles of artificial insemination. *Id.* ¶ 58. Aetna will also revise CPB 327 such that individuals with a uterus in an Eligible LGBTQ+ Relationship are not required to undergo any greater number of IUI cycles to qualify for IVF than individuals with a uterus in a heterosexual relationship. *Id.* ¶

---

[5] American Society for Reproductive Medicine, "Definitions of infertility: a committee opinion," Practice Committee of the American Society for Reproductive Medicine (Dec. 1, 2023).

59(a). Aetna will also apply its policies to allow for a treating physician to have peer-to-peer input regarding whether any IUI cycles needed to qualify for IVF coverage (applicable to those in an Eligible LGBTQ+ Relationship and those in a heterosexual relationship) need to be medicated versus unmedicated. *Id.* ¶ 59(b).

On June 1, 2024, Aetna will also begin the implementation of a new policy regarding the administration of IUI benefits, making IUI a standard medical benefit in all of the fully insured commercial plans that it issues and incorporating IUI as a standard medical benefit in the model self-funded plans that Aetna offers to administer (the "New IUI Policy"). *Id.* ¶ 57. Should any new or renewing self-funded plan sponsors request to deviate from the New IUI Policy or request a plan that does not conform to the changes to CPB 327 outlined above, Aetna will request an indemnification clause in the contracts, such that the self-funded plan sponsor would be required to indemnify Aetna for any costs incurred to defend against any claims brought in connection with that self-funded plan sponsor requiring individuals with a uterus in an Eligible LGBTQ+ Relationship to pay more for fertility services than individuals with a uterus with a sperm-producing partner. *Id.* ¶ 123.

As soon as practicable, and in no event later than the Final Approval Order, Aetna will implement all necessary programming changes and provide public and internal education and training to implement these policy changes. At minimum, this will include:

> (1)    training sessions regarding these policy changes for all Aetna employees who make precertification and post-service coverage determinations and for all Aetna employees who answer Aetna member inquiries and complaints related to infertility;

> (2)     an internal review of all public-facing documents that mention Aetna's
>          prior policy to change each document to reflect the policy changes; and
>
> (3)     public communications advertising these policy changes.

*Id.* ¶ 61.

## IV.   Monetary Relief for the Settlement Class

### A.   Award Amounts

Class Members will receive meaningful and substantial compensation under the Settlement Agreement.

The Settlement Agreement is structured so that each eligible Class Member receives, separate from the Common Fund, a Default Dollars for Benefits Amount of at least $2,300, if, according to Aetna's records, the Class Member's claims have not yet been reimbursed for infertility treatments undergone during the Class Period that Aetna has determined should have been covered under the individual's health benefits plan but for the Definition of Infertility. *Id.* ¶¶ 66(a)-(b). Eligible Class Members may receive a Dollars for Benefits Amount higher than $2,300 if they submit to Aetna a valid Proof of Greater Covered Care submission evidencing that they underwent covered fertility treatment that would have resulted in reimbursement exceeding $2,300 under the terms of their Aetna health benefits plan during the Class Period, but for the Definition of Infertility, as determined by Aetna. *Id.* ¶ 66(c). Class Members whose claims have already been reimbursed and who submit a valid Proof of Greater Covered Care submission may receive the difference between the previously reimbursed amount and the amount evidenced in their submission, as determined by Aetna. *Id.*

Class Members will also receive a Default Common Fund Amount of approximately $10,000 as compensation for additional damages suffered. *Id.* ¶ 67(a); Appendix B ¶ 5 (Allocation Plan). In the event that $2,000,000 is insufficient to fund payments of the Default Common Fund

Amount to all eligible Class Members—*i.e.*, if there are over 200 Class Members—the Class Members will receive equal pro-rata payments of the Default Common Fund Amount. Ex. 1, Appendix B ¶ 6 (Allocation Plan).

For various reasons, it is highly unlikely that there will be more than 200 Class Members. There are currently 67 Category A Class Members that the Parties agree are part of the Damages Settlement Class. Salzman Decl. ¶ 5(a). According to Aetna's estimates in discovery, there are likely to be approximately 49 eligible additional Class Members located from direct notice to individuals who were denied IUI or IVF coverage, increasing the estimated Damages Settlement Class to 116 Class Members (assuming a 100% response rate from this population, which is not realistic). *Id.* ¶ 5(b). Given the small size of Category A and even smaller estimated size of this second group (comprising both Category B members denied for IUI and the Category C members denied for IVF only), it is unlikely that the remaining potential Category C Class Members will yield an additional 84 eligible Class Members to bring the estimated total to 200 Class Members. It is not anticipated that direct notice to these potential Category C Class Members (*i.e.*, people who were approved for IVF but not IUI coverage) will yield many additional Class Members because, to be eligible Class Members, these individuals would have had to have: (1) been in an Eligible LGBTQ+ Relationship; and (2) completed the requisite 6 or 12 IUI cycles under Aetna's policy to qualify as "infertile," as was then required to receive approval for IVF coverage; but (3) not gotten pregnant through one of those 6 or 12 IUI cycles (obviating the need for seeking IVF coverage, a prerequisite to receiving direct notice). Publication notice is also not expected to yield many additional Category C Class Members because, for individuals to learn of the settlement via publication instead of direct notice, would mean that they never submitted any claims for fertility insurance coverage and therefore do not appear in Aetna's files at all. *Id.* ¶ 5(c). Given the incentive

to seek insurance coverage to defray the high cost of fertility treatments, it is not anticipated that there are many people who never sought coverage at all. For all these reasons, while it was important to the Parties to ensure that notice was sent to the broadest group possible, it is not realistic that there will be more than 200 Class Members. *Id.*

As a second priority, and to the extent funds remain after all Default Common Fund Amounts are paid, Class Members will also have the opportunity to make submissions for compensation for additional out-of-pocket expenses arising from the denial of fertility coverage by Aetna due to the Definition of Infertility, which the Special Master will evaluate pursuant to the Allocation Plan. Ex. 1 ¶¶ 67(b)-(d); Appendix B ¶¶ 9–10 (Allocation Plan). To the extent funds remain after the above payments are made, Class Members may also receive additional compensation for miscellaneous harms, such as extenuating circumstances rendering infertility procedures traumatic; extreme delay or total loss of the ability to become pregnant due to Aetna's challenged policy; and medical complications, such as miscarriage, associated with having to undergo certain infertility procedures. Ex. 1 ¶ 67(d); Appendix B ¶ 12 (Allocation Plan). The Special Master will also evaluate these submissions. *Id.* Finally, to the extent that all the above payments are made and funds remain in the Common Fund that the Administrator determines are administratively feasible and reasonable to redistribute, the Administrator will divide the remaining funds equally among all Class Members in an additional payment. Ex. 1 ¶ 67(e); Appendix B ¶ 13 (Allocation Plan). Conversely, if funds remain after said payments are made that the Administrator determines are administratively infeasible and unreasonable to redistribute, the Parties have agreed to ask the Court's approval to donate the remaining funds to an agreed-upon charity serving the LGBTQ+ community. *Id*. ¶ 67(e); Appendix B ¶ 14 (Allocation Plan).

### B. Eligibility

There are three ways Class Members can establish eligibility for the Default Common Fund

Amount: Categories A, B, and C. Category A Class Members will be entitled to the Default Common Fund Amount upon verification of their address by the Parties, and do not need to take any further action to receive a check for the Default Common Fund Amount. *Id.* ¶¶ 65, 66(d)(ii). Category B Class Members will be eligible to receive the Default Common Fund Amount upon their timely submission of the Attestation, which will establish that that they were in an Eligible LGBTQ+ Relationship at the time they sought coverage from Aetna. *Id.* ¶¶ 12, 33, 65(b), 66(d)(iii). Category C Class Members will be eligible to receive the Default Common Fund Amount upon the timely submission of the Attestation and of the Claim Submission Form, which will require information and supporting documentation evidencing that they underwent one or more cycles of artificial insemination during the Class Period, allowing them to receive the Default Common Fund Amount even though they did not seek coverage for IUI services during the Class Period. *Id.* ¶¶ 15, 36, 65(c), 66(d)(iv).

In addition to the Default Common Fund Amount, all Class Members are eligible for the Default Dollars for Benefits Amount of $2,300 if, according to Aetna's records, their claims for infertility treatments that were sought and denied during the Class Period have not yet been reimbursed and Aetna determines their claims should have been covered under the individual's health benefits plan, but for the Definition of Infertility. *Id.* ¶ 66(a). Class Members are also eligible to receive a higher Dollars for Benefits Amount if they submit a valid Proof of Greater Covered Care evidencing that they underwent covered infertility treatments during the Class Period that would have resulted in reimbursement exceeding $2,300 under the terms of their Aetna health benefits plan, but for the Definition of Infertility. *Id.* ¶ 64(c).

If an untimely claim is received by the Administrator within two months of the Bar Date— to be set 45 days before the Fairness Hearing, *id.* ¶ 13—the Settlement Agreement also permits

18

Class Counsel to instruct the Administrator to pay such claims if the claimant establishes "good cause" for their untimely submission, to be determined in Class Counsel's discretion. *Id.* ¶ 68.

### C.      Releases

Class Member who do not opt out of the settlement shall be deemed to have knowingly and voluntarily waived, released, discharged, and dismissed all claims or causes of action that were or could have been raised by the Class Representatives and/or the Class or any Class Member against Aetna or any of the Released Parties based on the factual allegations in the Complaint and/or the Amended Complaint, including but not limited to claims under 42 U.S.C. § 18116(a), N.Y. Exec. Law § 296(2)(a), N.Y.C. Admin. Code § 8-107(4), and/or 20 U.S.C. § 1681 *et seq.*, and 42 U.S.C. § 2000e *et seq.*, including any discrimination laws or regulations incorporated thereunder, for discrimination on the basis of sex, sexual orientation, and gender identity during the Class Period. *Id.* ¶ 122. To the extent a self-funded plan or plan sponsor deviates from Aetna's New IUI Policy or does not conform its plan to the changes to CPB 327 outlined in Section III., *supra*, Class Members will not be barred from pursuing claims against Aetna, the self-funded plan, or plan sponsor. *Id.*

## V.      Administrative Costs, Service Awards, and Attorneys' Fees and Costs

Aetna has agreed to pay administrator and Special Master costs, service awards, and attorneys' fees and costs, separate from, and in addition to, the Common Fund and the Dollars for Benefits. *Id.* ¶¶ 85, 97, 104.

### A.      Administrative Costs

The Parties have selected Atticus Administration LLC as the Administrator, which has extensive experience administering class action agreements. Salzman Decl. ¶ 27; Bridley Decl. ¶¶ 3-4; Bridley Decl. Ex. A (curriculum vitae outlining Atticus's services and experience). Under the terms of the Settlement Agreement, the Administrator's administrative costs, costs of direct notice,

and costs of publication notice will be paid by Defendant directly to the Administrator and will be paid separately from the awards to the Class Members. Ex. 1 ¶¶ 84-85.

In addition to the notice program described *infra* Section V, the Administrator's duties administering the Settlement Agreement include: (1) issuing notice, including information about the right to object or opt out of the settlement; (2) distributing Claim Form Packages to and receiving executed forms from the Claim Form Package from Class Members, as applicable pursuant to Paragraph 75 of the Settlement Agreement; (3) establishing and administering the Common Fund and, upon conclusion of the process, closing the Common Fund; (4) determining eligibility for Default Common Fund Amount awards on the basis of information provided by counsel for the Parties and by the Class Members, validating the claims, and providing Class Counsel and Defendant's Counsel a list of those persons found preliminarily eligible every 30 days; (5) evaluating Out-of-Pocket Expense Submissions and calculating the amounts of payments for out-of-pocket expenses pursuant to the Allocation Plan, in conjunction with the Special Master; (6) issuing and mailing payments to eligible Class Members, and issuing and filing all required tax forms and statements; (7) responding to inquiries from Class Members about this Agreement and the procedures contained herein, including by the use of a toll-free number and a website; (8) collating all objections to the Agreement for Class Counsel and Counsel for Defendant; (9) creating a database of Class Members who have filed timely and valid forms, as applicable pursuant to Paragraph 65 of the Settlement Agreement; (10) creating a database of Opt-Outs; (11) coordinating and advancing payment for publication notice per Paragraphs 65(e), 81 of the Settlement Agreement; (12) providing the Parties with regular bills and a final accounting; and (13) to the extent not listed here, the tasks enumerated in the Administrative Proposal attached as Appendix A to the Settlement Agreement. Ex. 1 ¶ 84, Appendix A; Bridley Decl. ¶¶ 5-16 & Ex. I;

Salzman Decl. ¶ 41.

Aetna (rather than the Administrator) will issue the Dollars for Benefits payments, following Aetna's re-processing of Class Members claims that have not yet been processed. Ex. 1 ¶¶ 66(d)(i)–(vii).

### B.     Service Awards

In accordance with the Settlement Agreement, Plaintiffs will request in their Motion for Final Approval that the Court approve service awards for the four Named Plaintiffs in the amount of $15,000 each, in recognition of the services they rendered on behalf of the Class and for the inconvenience, pain, suffering, and other non-pecuniary loss experienced as a result of having been a named plaintiff in this action. Ex. 1 ¶ 104. Those services included providing detailed personal and medical information about their experiences seeking and undergoing infertility treatments and the physical and emotional stress on them and their families. Named Plaintiffs also approved key terms of the settlement and were available for settlement conferences. Salzman Decl. ¶ 29. The Court need not decide at this juncture whether the service awards Plaintiffs will request are reasonable; Plaintiffs will brief that question in advance of the Fairness Hearing. If the Court approves the service awards, Aetna will pay these awards separate from and in addition to the Common Fund, so the awards will not deplete the compensation awarded to all Class Members. Ex. 1. ¶ 104.

### C.     Attorneys' Fees and Costs

At or about the time of the Motion for Final Approval, Class Counsel will make an application seeking Court approval for attorneys' fees and expenses, in the amount of $1,625,000.00, agreed to by the Parties in the mediation. Ex. 1 ¶ 96. Aetna will pay Class Counsel's attorneys' fees and costs separate and apart from the money used to fund the Common Fund. *Id*. ¶ 97. The Court need not decide at this juncture whether the attorneys' fees and expenses amount

Plaintiffs will request are reasonable; Plaintiffs will brief that question in advance of the Fairness Hearing.

## PRELIMINARY APPROVAL OF THE SETTLEMENT IS APPROPRIATE

The law favors compromise and settlement of class action suits. *See Wal-Mart Stores, Inc. v. Visa U.S.A., Inc.*, 396 F.3d 96, 116–17 (2d Cir. 2005) (noting the "strong judicial policy in favor of settlements, particularly in the class action context"); *In re Warfarin Sodium Antitrust Litig.*, 391 F.3d 516, 535 (3d Cir. 2004) ("[T]here is an overriding public interest in settling class action litigation, and it should therefore be encouraged."); *Reyes v. Summit Health Mgmt., LLC*, No. 22 Civ. 9916, 2024 WL 472841, at *1 (S.D.N.Y. Feb. 6, 2024) ("The parties and their counsel are in a unique position to assess the potential risks of litigation, and thus district courts in exercising their discretion often give weight to the fact that the parties have chosen to settle.").[6] "Courts encourage early settlement of class actions, when warranted, because early settlement allows class members to recover without unnecessary delay and allows the judicial system to focus resources elsewhere." *Hernandez v. Merrill Lynch & Co., Inc.*, No. 11 Civ. 8472, 2012 WL 5862749, at *2 (S.D.N.Y. Nov. 15, 2012); *see also Diaz v. E. Locating Serv., Inc.*, No. 10 Civ. 4082, 2010 WL 5507912, at *3 (S.D.N.Y. Nov. 29, 2010) (giving "weight to the parties' judgment that the settlement is fair and reasonable"). The Parties here acted responsibly in reaching a settlement in this case.

To grant preliminary approval of a settlement, a court must find that it "will be likely able to: (i) approve the proposal under Rule 23(e)(2); and (ii) certify the class for purposes of judgment on the proposal." Fed. R. Civ. P. 23(e)(1)(B); *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d 686, 692 (S.D.N.Y. 2019) (describing standard for preliminary approval post-2018 amendments

---

[6] All citations have been "cleaned up."

to Rule 23). In other words, the court "must consider the factors relevant to final approval and certification, and it must conclude that it is likely to find that those factors are satisfied." *Gordon v. Vanda Pharms. Inc.*, No. 19 Civ. 1108, 2022 WL 4296092, at *2 (E.D.N.Y. Sept. 15, 2022). The factors relevant to final approval under Rule 23(e)(2) are: (1) adequacy of representation, (2) existence of arm's-length negotiations, (3) adequacy of relief, and (4) equitableness of treatment of class members. Fed. R. Civ. P. 23(e)(2). Courts in this district also consider the nine factors set forth in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448, 463 (2d Cir. 1974), which, prior to the 2018 amendments to Rule 23, governed the analysis of whether a settlement was "fair, reasonable, and adequate." *See In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 692; *Gordon,* 2022 WL 4296092, at *3. The *Grinnell* factors are addressed where relevant below.[7]

## I.   Adequacy of Representation

Rule 23(e)(2)(A) requires the Court to analyze whether "the class representatives and class counsel have adequately represented the class." In determining the adequacy of class representatives and counsel, courts consider "whether (1) plaintiff's interests are antagonistic to the interest[s] of other members of the class and (2) plaintiff's attorneys are qualified, experienced, and able to conduct the litigation." *Mikhlin v. Oasmia Pharm. AB*, No. 19 Civ. 4349, 2021 WL 1259559, at *4 (E.D.N.Y. Jan. 6, 2021) (quoting *Cordes & Co. Fin. Servs., Inc. v. AG. Edwards & Sons, Inc.*, 502 F.3d 91, 99 (2d Cir. 2007)).

Named Plaintiffs Emma Goidel, Ilana Lee, Madeleine Lee, and Lesley Brown have common interests with other members of the Class and no interests that are antagonistic to the

---

[7] The *Grinnell* factors are (1) the complexity, expense, and likely duration of the litigation; (2) the reaction of the class to the settlement; (3) the stage of the proceedings and the amount of discovery completed; (4) the risks of establishing liability; (5) the risks of establishing damages; (6) the risks of maintaining the class action through the trial; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement in light of the best possible recovery; and (9) the range of reasonableness of the settlement to a possible recovery in light of all the attendant risks of litigation. *Grinnell*, 495 F.2d at 463.

other Class Members. The Named Plaintiffs suffered the same "general injury as the rest of the class"—denial of coverage for the infertility benefits within their health benefits plan based on Aetna's Definition of Infertility. They also seek the same relief as the other Class Members, namely, an injunction on Aetna's continued implementation and enforcement of a discriminatory infertility benefits policy, and damages to compensate them for the harms that they suffered as a result of their denials, including for the out-of-pocket expenses incurred for medically unnecessary infertility treatments undergone to meet Defendant's Definition of Infertility. ECF No. 1 ¶¶ 159–161, 173. Given their common injuries and the common remedies sought, the Named Plaintiffs have an "interest in vigorously pursuing the claims of the class." *In re GSE Bonds Antitrust Litig.*, 414 F. Supp. 3d at 692 (quoting *Denney v. Deutsche Bank AG*, 443 F.3d 253, 268 (2d Cir. 2006)).

Further, Class Counsel are qualified, experienced, and able to conduct this litigation, assess the strengths and weaknesses of the case, and negotiate settlement. As further described above (*supra* Section I.C.), over the course of more than two years, they sought and obtained tens of thousands of pages of data, in order to document how Aetna's Definition of Infertility was being implemented in practice and to identify individuals within Aetna's system whose records reflected denial of fertility treatments for failure to meet the Definition of Infertility's discriminatory requirements. After obtaining the data, Class Counsel identified and retained consulting experts in infertility treatments and conducted analysis of massive datasets that were crucial for prosecuting the merits of the case and for supporting Plaintiffs' position in settlement negotiation. Salzman Decl. ¶¶ 12-13.

Class Counsel are experienced attorneys with strong reputations and expertise in civil rights law. Emery Celli Brinckerhoff Abady Ward & Maazel LLP ("ECBAWM") has been recognized as having a "wealth of experience handling complex class actions," and has been found

adequate by other courts in the context of preliminary class action settlement approval. *See Rosenfeld v. Lenich*, No. 18 Civ. 6720, 2021 WL 508339, at *5 (E.D.N.Y. Feb. 11, 2021); *Wise v. Kelly*, 620 F. Supp. 2d 435, 445 (S.D.N.Y. 2008). In at least two class actions where ECBAWM served as lead counsel, courts in this district described the firm as "preeminent." *Brown v. Kelly*, 244 F.R.D. 222, 233 (S.D.N.Y. 2007), *aff'd in part, vacated in part on other grounds*, 609 F.3d 467 (2d Cir. 2010); *Betances v. Fischer*, 304 F.R.D. 416, 428 (S.D.N.Y. 2015). Courts have taken "judicial notice of [ECBAWM]'s high reputation, finding it to be one of the most competent, successful, and reputable civil rights firms practicing in this Court." *Wise*, 620 F. Supp. at 445.

The National Women's Law Center ("NWLC") is a national, non-profit legal advocacy organization that fights for gender justice, working across the issues that are central to the lives of women and girls—especially women of color, LGBTQ people, and low-income women and families. Since its founding in 1972, NWLC has worked to advance educational opportunities, workplace justice, health and reproductive rights, and income security in legislature, before administrative agencies, and in the courts, including before Courts of Appeals and the U.S. Supreme Court. This work has included participating in multiple class actions to ensure that rights and opportunities are not restricted based on sex. *See, e.g.*, *Borders v. Walmart Stores, Inc.*, No. 17 Civ. 506, 2020 WL 13190099 (S.D. Ill. 2020); *Communities for Equity v. Mich. High Sch. Athletics Ass'n*, 192 F.R.D. 583 (W.D. Mich. 1999).

## II.   Arm's Length Negotiations

Rule 23(e)(2)(B) requires procedural fairness, *i.e.*, that "the proposal was negotiated at arm's length." In evaluating procedural fairness, the court must examine "the negotiating process leading to settlement." *Wal-Mart Stores*, 396 F.3d at 116; *see also D'Amato v. Deutsche Bank*, 236 F.3d 78, 85 (2d Cir. 2001). "A court reviewing a proposed settlement must pay close attention to the negotiating process, to ensure that the settlement resulted from arm's-length negotiations and

that plaintiffs' counsel have possessed the experience and ability, and have engaged in the discovery, necessary to effective representation of the class's interests." *D'Amato*, 236 F.3d at 85; *see also Reyes*, 2024 WL 472841, at *3 ("The existence of arm's-length negotiations further counsels in favor of approving the settlement on a preliminary basis.").

Here, negotiations between the Parties were lengthy, complex, vigorously contested, and always conducted at arm's length. As set forth in more detail above (*supra* Section I.C.), the Parties engaged in extensive pre-negotiation discovery, including Plaintiffs' pre-filing investigation, and then multiple rounds of document discovery seeking the relevant policies, practices, staff training materials, and directives of Aetna; electronic data maintained by Aetna regarding its processing of fertility benefits claims; and electronic communications between Aetna personnel regarding implementation of CPB 327. Salzman Decl. ¶ 12. Settlement negotiations began in earnest once the Parties believed document discovery was complete or very close to complete, Salzman Decl. ¶ 15., at which point "the Parties had a full opportunity to acquaint themselves with the strength of the case." *Reyes*, 2024 WL 472841, at *3.

As set forth in more detail above (*supra* Section I.D.), the Parties—who were represented by experienced, highly capable counsel—engaged in more than eleven months of protracted settlement negotiations among themselves, and participated in a mediation and follow-up conferences with retired Magistrate Judge Steven M. Gold to resolve key settlement terms, including the Common Fund amount to be funded by Aetna. *Cf. D'Amato*, 236 F.3d at 85 ("[A] court-appointed mediator's involvement in pre-certification settlement negotiations helps to ensure that the proceedings were free of collusion and undue pressure."); *Lea v. Tal Educ. Grp.*, No. 18 Civ. 5480, 2021 WL 5578665, at *8 (S.D.N.Y. Nov. 30, 2021) (same). The Parties exchanged multiple draft settlement proposals, discussed terms in detail by video conference, over

email, and in person, and negotiated significant issues, such as the definition of the three Class Member categories, the scope and method of class notice, the terms of the non-disparagement clause, the scope and timeline of the implementation of the injunctive relief, the structure and timing of payment of individual awards, the amount Aetna would deposit into the Common Fund, and many others. Salzman Decl. ¶¶ 17-18. The Parties' "vigorous" litigation of the case and the settlement terms demonstrates their lack of collusion. *Gordon*, 2022 WL 4296092, at *4.

The foregoing suggests that the settlement here was the result of good-faith arm's-length negotiations, as required by Rule 23(e)(2)(B).

## III.   Adequacy of Relief

Rule 23(e)(2)(C) requires examining whether relief for the class is adequate, taking into account: (i) the costs, risks, and delay of trial and appeal; (ii) the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims, if required; (iii) the terms of any proposed award of attorney's fees, including timing of payment; and (iv) any agreement required to be identified under Rule 23(e)(3). *In re GSE Bonds Antitrust Litig.*, No. 19 Civ. 1704, 2019 WL 6842332, at *2 (S.D.N.Y. Dec. 16, 2019).

### A.   Costs, Risk, and Delay of Trial and Appeal

By reaching a favorable settlement prior to dispositive motions or trial, Plaintiffs seek to avoid significant expense, risk, and delay and ensure timely recovery for the Class.

"Most class actions are inherently complex, and settlement avoids the costs, delays and multitude of other problems associated with them." *In re Austrian & German Bank Holocaust Litig.*, 80 F. Supp. 2d 164, 174 (S.D.N.Y. 2000), *aff'd sub nom. D'Amato*, 236 F.3d 78. This case is no exception. With a class period dating back to 2017, significant amounts of data requiring analysis, and complex, cutting-edge, and evolving issues of law and fact, this case is extraordinarily complex. Further litigation here would cause additional, significant expense and

delay. No depositions have been taken so far, including of high-level executives and other key employees of Aetna, or of any of the Named Plaintiffs. Similarly, while Plaintiffs have engaged and consulted heavily with multiple subject-matter experts, expert discovery in this case would be extensive, including the exchange of reports and depositions. Salzman Decl. ¶ 49.

Even after completing discovery, the Parties envision summary judgment and class certification motions raising many technical and emerging issues of law, such as whether Aetna's fertility policy discriminates based on sex under Section 1557 of the ACA, whether Defendant can be held liable under the ACA for its role as a third-party administrator of self-funded plans, and whether Defendants would challenge the suitability of class certification under Federal Rule of Civil Procedure 23. While Plaintiffs believe the class would be certified and summary judgment granted in its favor, both motions present legitimate risks to the class. *Id*. ¶ 50. Further, considerable time and resources would likely be expended on the inevitable appeals of the Court's decisions on class certification and summary judgment. *Id*. .

If Plaintiffs succeed in certifying the class and obtaining summary judgment, a fact-intensive trial would likely be necessary to determine damages—and, depending on the outcome of any summary judgment motions, may also be needed to determine certain issues related to liability. A trial would be lengthy and complex. While Plaintiffs believe that they could ultimately establish both liability and damages, this would require significant factual development, requiring hundreds of additional hours of discovery, plus the time and resources required to litigate dispositive motions and prevail at trial, and then prevail again on appeal. *Id*. ¶ 51. Class Members would not obtain relief for years—and would potentially continue to be denied the infertility treatments they need to build their families. This settlement, on the other hand, makes monetary and injunctive relief available to Class Members in a prompt and efficient manner. *Id*. ¶ 52; *Lea*,

2021 WL 5578665, at *9 (preliminary approval appropriate where it brought to a close litigation "that could have lasted several more years and cost hundreds of thousands of dollars in attorneys' fees and expenses and brings immediate relief to the class").

Further, although Plaintiffs believe their case is strong, it is subject to considerable risk, including the risk of obtaining and maintaining class certification through trial. "Litigation inherently involves risks." *In re PaineWebber Ltd. P'ships Litig.*, 171 F.R.D. 104, 126 (S.D.N.Y. 1997). Defendants could defeat class certification, win a dispositive pre-trial motion, or obtain a favorable verdict at trial—in those situations, Class Members would be left with no relief at all. Even if Plaintiffs win a favorable verdict and an award of damages, the verdict or damages award could be reversed or reduced on appeal. In contrast, "[t]he proposed settlement benefits each plaintiff in that he or she will recover a monetary award immediately, without having to risk that an outcome unfavorable to the plaintiffs will emerge from a trial." *Velez v. Majik Cleaning Serv., Inc.*, No. 03 Civ. 8698, 2007 WL 7232783, at *6 (S.D.N.Y. June 25, 2007).

Class Counsel are experienced and realistic, and they understand that the resolution of liability issues, the outcome of the trial, and the inevitable appeals processes are inherently uncertain in terms of outcome and duration. The proposed settlement alleviates these uncertainties. Therefore, Rule 23(e)(2)(C)(i), the first *Grinnell* factor (the complexity, expense, and likely duration of the litigation), the fourth *Grinnell* factor (the risks of establishing liability), the fifth *Grinnell* factor (the risks of establishing damages), and the sixth *Grinnell* factor (the risks of maintaining the class action through the trial) all weigh in favor of approval.

### B.    Effectiveness of the Proposed Method of Distributing Relief

Rule 23(e)(2)(C)(ii) requires courts to examine "the effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims." While the claims processing method "should deter or defeat unjustified claims, [] the court should be

alert to whether the claims process is unduly demanding." *In re Payment Card Interchange Fee and Merch. Disc. Antitrust Litig.*, 330 F.R.D. 11, 40 (E.D.N.Y. 2019) (citing Fed. R. Civ. P. 23 advisory committee's note to 2018 amendment). "To warrant approval, the plan of allocation must also meet the standards by which the settlement was scrutinized — namely, it must be fair and adequate. . . . [a]n allocation formula need only have a reasonable, rational basis, particularly if recommended by experienced and competent class counsel." *Id.* (citing *In re WorldCom, Inc. Sec. Litig.*, 388 F. Supp. 2d 319, 344 (S.D.N.Y. 2005)); *see also Reyes*, 2024 WL 472841, at *4 (quoting *In re Advanced Battery Techs., Inc. Sec. Litig.*, 298 F.R.D. 171, 180 (S.D.N.Y. 2014)) ("When formulated by competent and experienced class counsel, a plan for allocation of net settlement proceeds need have only a reasonable, rational basis.").

The allocation of settlement awards to Damages Class Members is equitable. All Damages Class Members will be entitled to at least $2,300, the Default Dollars for Benefits Amount, for care that would have been covered by the Member's medical plan but for the Definition of Infertility, to the extent that the Member's claim has not yet been reimbursed by Aetna for the same. Class Members can also receive an additional Dollars for Benefits Amount if they can demonstrate, through appropriate documentation, that they would have been reimbursed by Aetna under their medical plan for an amount greater than $2,300 but for the Definition of Infertility.

Further, a Default Common Fund Amount of approximately $10,000 to each eligible Damages Class Member is equitable. Because the Defendant has agreed to deposit $2,000,000 into the Common Fund—from which all claims other than the Dollars for Benefits Amounts must be apportioned—the Default Common Fund Amount will only be lower than $10,000 in the unlikely event that there are so many Damages Class Members such that $2,000,000 is insufficient to cover

a $10,000 payment to all members—*i.e.*, in the event that there are over 200 Class Members.[8] In such an event, the Default Common Fund Amount will be reduced pro rata, such that payments to Damages Class Members remain equitable.

The claims processing method proposed by the Parties uses well-established, effective procedures for receiving, processing, and validating claims. *See Lea*, 2021 WL 5578665, at *11. As described *infra* (Section IV), the Administrator will distribute hard-copy Claim Form Packages to Class Members when it provides direct notice by first-class mail to potential Class Members. Ex. 1 ¶ 75. Notice to potential Class Members will also include electronic links to the settlement website, where Class Members will be able to submit claims electronically. Ex. 1 ¶ 84. The Administrator will also make the Claim Form Package available on the settlement website, and Class Members can submit the applicable forms required for eligibility for the Default Common Fund Amount, and, for some Class Members, the Default Dollars for Benefits Payment, online through the settlement website. Bridley Decl. ¶¶ 14-16. Category A Class Members do not need to submit anything. Ex. 1 ¶ 76(a). Category B Class Members must submit an Attestation, and Category C Class Members must submit an Attestation and a Claim Form Submission. Ex. 1 ¶¶ 76 (b)-(c).

The Settlement also ensures that Class Members are not disadvantaged by failing to meet the claims form deadline if they have good cause. Class Members can submit untimely claims upon a showing of good cause (as determined by Class Counsel) for up to two months after the Bar Date. *Id.* ¶ 68.

If the Court grants Final Approval of the Settlement Agreement, the Administrator will then distribute checks to Class Members who have submitted valid forms to establish eligibility,

---

[8] For the reasons discussed *supra* p. 16-17, it is highly unlikely that there will be over 200 Class Members.

as applicable to their category. *Id.* ¶¶ 66(d), 67(g). If any of those checks is returned to the Administrator, the Administrator will conduct additional address searches and re-issue and resend checks. *Id.* at ¶¶ 71-72.

### C.    The Terms of Any Proposed Award of Attorneys' Fees and Expenses

Rule 23(e)(2)(C)(iii) requires courts to examine "the terms of any proposed award of attorneys' fees, including timing of payment." *See also Moses v. N.Y. Times Co.*, 79 F.4th 235, 246 (2d Cir. 2023). Here, the Parties negotiated an attorneys' fees and expenses award of $1,625,000. *Id.* ¶ 105. Class Counsel's attorneys' fees and costs will not be deducted from the Common Fund. Instead, Defendant agreed to pay Class Counsel's attorneys' fees and costs separate and apart from the Common Fund. Ex. 1 ¶ 95. The amount agreed to for attorneys' fees and costs was negotiated separately and only *after* the Parties had already agreed to the amount for the Common Fund. Salzman Decl. ¶ 18. The amount of the attorneys' fees and costs was mediated by the Honorable Steven M. Gold, following his review of Class Counsel's preliminary billing records. *Id.* This agreement as to attorneys' fees and costs further weighs in favor of settlement approval. *See Sow v. City of New York*, No. 21 Civ. 00533, 2024 WL 964595, at *6 (S.D.N.Y. Mar. 5, 2024) ("Because the attorneys' fees and costs in this case are not paid from a common fund, i.e., the 'money paid to the attorneys is entirely independent of money awarded to the class,' . . . 'the Court's fiduciary role in overseeing the award is greatly reduced, because there is no conflict of interest between attorneys and class members.' . . . Moreover, '[t]he negotiation of fee agreements is generally encouraged.'") (internal citations omitted). *Contra Moses*, 79 F.4th at 246 (expressing concerns as to fairness of settlement where the fee awards were "intimately intertwined with the settlement," *i.e.*, due to there being "effectively an inverse correlation between the amount of attorneys' fees and incentive payment awarded and the cash available for *pro rata* distribution to class members that opt for cash").

32

The Court need not finally approve the appropriate fee award now. Plaintiffs will brief that question in advance of the fairness hearing and provide attorneys' affidavits and billing records for the Court's examination, at which point the Court will have substantially more information about the appropriateness of the fee award and the benefit of Class Counsel's representation to the class.

### D.      Any Agreement Required to Be Identified Under Rule 23(e)(3)

Rule 23(e)(2)(C)(iv) requires courts to consider "any agreement required to be identified by Rule 23(e)(3)," that is, "any agreement made in connection with the proposal." The Parties have not entered into any agreements other than the Settlement Agreement that has been submitted for approval.[9] Accordingly, this factor poses no obstacle to preliminary approval. *See Rosenfeld,* 2021 WL 508339, at *7.

### E.      Equitable Treatment of Class Members

Rule 23(e)(2)(D) requires the Court to consider whether "the proposal treats class members equitably relative to each other." Here, eligible Class Members are treated equitably relative to each other in that they each will receive the same Default Common Fund Amount (approximately $10,000) and Default Dollars for Benefits Amount of $2,300 unless their claims have already been reimbursed, with the ability to receive additional Dollars for Benefits reimbursement upon evidencing proof of greater covered care exceeding $2,300.

The structure of the Settlement Agreement allows each Class Member to be eligible for at least $2,300 in reimbursement for claims for coverage related to infertility treatments that were performed during the Class Period and that Aetna has determined would have been covered under the individual's health benefit plan but for Aetna's Definition of Infertility, to the extent their claim

---

[9] The Parties' September 22, 2023, Term Sheet was non-binding and thus not an "agreement made in connection with the proposal." *See Reyes*, 2024 WL 472841, at *5.

has not already been reimbursed. Class Members who submit valid Proof of Greater Covered Care evidencing that they underwent covered infertility treatment(s) during the Class Period that would have resulted in reimbursement exceeding $2,300 by their Aetna health care plan if not for the Definition of Infertility will be eligible to receive additional payment for the difference between $2,300 and the amount their Aetna healthcare plan would have reimbursed, as determined by Aetna.

Class Members are also eligible to receive the Default Common Fund Amount of approximately $10,000, subject to final class size. Category A Class Members will be eligible for this payment automatically; Category B Class Members must submit an Attestation to be eligible; and Category C Class Members must submit an Attestation and Claim Form Submission. Salzman Decl. ¶ 44. Given that Aetna's records only indicate which members sought and were denied coverage for infertility benefits due to the discriminatory Definition of Infertility, and do not account for members who underwent infertility treatments but did not submit a claim for benefits, the categorization of the Class Members allows for streamlined and structured identification process for the Parties, puts minimal burden on most Class Members to produce documentation, and allows for the most inclusive possible Damages Settlement Class, while simultaneously ensuring that unjustified claims are filtered out. *Id*. ¶ 45.

For example, the Parties agree that all Category A Class Members sought and were denied coverage for infertility treatment due to the Definition of Infertility and were in an Eligible LGBTQ+ Relationship (identifiable in Aetna's records due to the recorded sexes of the primary plan member and her spousal dependent plan member, as well as in some instances the text of the relevant claim denial letter). *Id*. ¶ 46. The Settlement therefore provides that all Category A Class Members will receive the Default Common Fund Amount and Default Dollars for Benefits

payments so long as they do not opt out and the Administrator can verify their addresses. For Category B Class Members, Class Counsel was able to identify insurance codes during discovery that reflected the denial of infertility coverage due to the Definition of Infertility. *Id*. ¶ 47. Category B Class Members, therefore, will not need to submit documentation of their interactions with Aetna that they may not have access to or that may be onerous for someone without a medical background to obtain—a requirement that would be burdensome and inefficient. *Id*. To be eligible for both the Default Common Fund Amount and the Default Dollars for Benefits Amounts, Category B Class Members will only need to attest to the fact that they were in an Eligible LGBTQ+ Relationship at the time they sought coverage—information which is not available in Aetna's files for Category B Class Members. *Id*. Finally, as a result of Class Counsel's negotiations, Category C Class Members will receive the Default Common Fund Amount and the Default Dollars for Benefits Amount so long as they submit the same Attestation as Category B members and a Claim Form Submission, even though Aetna never denied them IUI coverage, an approach that is as inclusive as possible. *Id*. ¶ 48.

As part of this factor, the Court must also consider the incentive payments proposed in the Settlement. *See Reyes*, 2024 WL 472841, at *6. "The guiding standard in determining an incentive award is broadly stated as being the existence of special circumstances including the personal risk (if any) incurred by the plaintiff-applicant in becoming and continuing as a litigant, the time and effort expended by that plaintiff in assisting in the prosecution of the litigation or in bringing to bear added value (e.g., factual expertise), any other burdens sustained by that plaintiff in lending himself or herself to the prosecution of the claim, and, of course, the ultimate recovery." *Kurtz v. Kimberly-Clark Corp.*, No. 14 Civ. 1142 & 15 Civ. 2910, 2024 WL 184375, at *4 (E.D.N.Y. Jan. 17, 2024). "Rule 23(e)(2)(D) does not forbid incentive awards." *Moses*, 79 F.4th at 245. Rather,

the Rule requires courts to reject incentive awards that are "excessive compared to the service provided by the class representative or that are unfair to the absent class members." *Id.* Courts in this District have approved service awards for individual representative plaintiffs that range from $1,000 to $85,000. *See Reyes*, 2024 WL 472841, at *6 n.5 (gathering cases).

The Parties have agreed on a proposed $15,000 service award for each Named Plaintiff. Ex. 1 ¶ 104. Each Named Plaintiff bravely underwent personal risk in this case by publicly identifying herself as in an LGBTQ+ relationship and in need of infertility treatments to build her family. Salzman Decl. ¶ 40. Each Named Plaintiff also dedicated dozens of hours to assisting with the prosecution of this litigation, including by producing substantial personal information and correspondence at the demand of the Defendant and working with Class Counsel throughout discovery and settlement negotiations. *Id*. Further, each exposed her private medical records and other intimate information to discovery and scrutiny. *Id*. Because of the Named Plaintiffs' service, all other Class Members will not need to publicly disclose their LGBTQ+ or family-building status, nor will Category A or B Class Members need to produce any medical records to receive the Default Common Fund and Default Dollars for Benefits Amounts. Thus, the requested incentive awards for the Named Plaintiffs are reasonable in light of the particular circumstances of this case.

The service awards, like attorneys' fees and costs, will also be paid separate and apart from the Common Fund, Ex. 1 ¶ 104, further weighing in favor of approving the settlement, as the Court need not be concerned that incentive awards could decrease the "the cash available for *pro rata* distribution to class members." *Moses*, 79 F.4th at 246.

### F.    Other Grinnell Adequacy Factors

The other *Grinnell* adequacy factors, 495 F.2d at 463, weigh in favor of the class settlement or are neutral as applied here.

The second *Grinnell* factor—the reaction of the class to the settlement—favors approval.

36

Named Plaintiffs have expressed their approval of the settlement by agreeing to the settlement, Salzman Decl. ¶ 40, and their "approval is probative of the Class's reaction at this time." *Reyes*, 2024 WL 472841, at *6. The Court should more fully analyze this factor after notice is issued and Class Members are given the opportunity to opt out or object. *Cf. Parker v. City of New York*, No. 15 Civ. 6733, 2017 WL 6375736, at *6 (E.D.N.Y. Dec. 11, 2017) (reaction of class to the settlement may be evaluated after notice of the proposed settlement has been sent to the class and the time for objections has passed).

The third *Grinnell* factor—the stage of the proceedings and the amount of discovery completed—also favors approval of the Settlement Agreement. The relevant inquiry "is whether the plaintiffs have obtained a sufficient understanding of the case to gauge the strengths and weaknesses of their claims and the adequacy of the settlement." *In re GSE Bonds Antitrust Litig.*, 2019 WL 6842332, at *4. As described *supra* (Section I.C.), Plaintiffs obtained voluminous discovery from Defendant. Salzman Decl. ¶ 12. Plaintiffs used this information not only to assemble proof of Defendant's policies and practices and the impact thereof on potential Class Members, but also to understand the strengths and weaknesses of their liability and damages claims. *Id*. As such, Plaintiffs possess adequate information about the merits of their claims to assess Defendant's position in settlement negotiations. *See In re GSE Bonds Antitrust Litig.*, 2019 WL 6842332, at *4; *Reyes*, 2024 WL 472841, at *3, 6 (pre-filing investigation, followed by seven months of pre-settlement discovery, evidenced sufficient understanding of the case). In addition, the thoroughness of the discovery performed here favors preliminary approval. *See, e.g.*, *McMahon v. Olivier Cheng Catering & Events, LLC*, No. 08 Civ. 8713, 2010 WL 2399328, at *5 (S.D.N.Y. Mar. 3, 2010) (finding that the parties' "efficient, informal exchange of information" was enough discovery to recommend settlement approval). Indeed, courts often grant final approval of class

settlements in cases where the parties conducted less discovery than in this case. *See, e.g.*, *Matheson v. T-Bone Rest., LLC*, No. 09 Civ. 4214, 2011 WL 6268216, at *5 (S.D.N.Y. Dec. 13, 2011) (granting final approval where parties engaged in informal information exchange with no depositions because "Plaintiffs obtained sufficient discovery to weigh the strengths and weaknesses of their claims" and "[t]he parties' participation in a day-long mediation allowed them to further explore the claims and defenses"). Here, where Class Counsel engaged in extensive document discovery, consulted with experts, and engaged in a mediation with a neutral third-party mediator, this factor unquestionably favors preliminary approval.

The seventh *Grinnell* factor—the ability of the defendant to withstand a greater judgment—does not preclude approval of the Settlement Agreement. Defendant, as a nationally managed health care company, may certainly be able to withstand a greater judgment. Nevertheless, courts have determined "the amount of the settlement, when considered with the other *Grinnell* factors, does not alone render the settlement unfair." *Frank v. Eastman Kodak Co.*, 228 F.R.D. 174, 186 (W.D.N.Y. 2005).

The eighth *Grinnell* factor—the range of reasonableness of the settlement in light of the best possible recovery—and the ninth *Grinnell* factor—the range of reasonableness of the settlement as compared to possible recovery in light of all the attendant risks of litigation—both favor approval of the Settlement Agreement. These factors are "often combined for the purposes of analysis." *In re Payment Card*, 330 F.R.D. at 47–48. "In considering the reasonableness of the settlement fund, a court must compare the terms of the compromise with the likely rewards of litigation." *Id.* at 48. The range of reasonableness for a settlement is "a range which recognizes the uncertainties of law and fact in any particular case and concomitant risks and costs necessarily inherent in taking any litigation to completion." *Wal-Mart Stores*, 396 F.3d at 119. Here, the

settlement amount falls within the range of reasonableness in light of the best possible recovery: as awards for discrimination on the basis of sex can range from a few hundred dollars to many thousands of dollars, an award of approximately $10,000, at minimum (plus an additional $2,300 for a Class Member whose claim has not already been reimbursed), per Class Member is reasonable, especially considering that courts frequently approve class settlements even where the benefits represent "only a fraction of the potential recovery." *In re Initial Pub. Offering Secs. Litig.*, 671 F. Supp. 2d 467, 483–85 (S.D.N.Y. 2009) (approving settlement that provided only a "miniscule" 2% of defendants' maximum possible liability and observing that "[t]he Second Circuit has held that a settlement amount of even a fraction of the potential recovery does not render a proposed settlement inadequate"); *Hall v. Children's Place Retail Stores, Inc.*, 669 F. Supp. 2d 399, 402 n.30 (S.D.N.Y. 2009) (approving settlement that amounted to 5–12% recovery of provable damages); *In re Crazy Eddie Secs. Litig.*, 824 F. Supp. 320, 324 (E.D.N.Y. 1993) (approving settlement that awarded class members between 6 and 10 cents for every dollar lost).

Finally, there are significant risks of litigation that would result in Class Members receiving no recovery at all. Salzman Decl. ¶ 42. Therefore, as compared to the best possible recovery and as compared to possible recovery in light of the risks of litigation, the Settlement Agreement provides better recovery to Class Members. *See Frank*, 228 F.R.D. at 186 (determination of whether a settlement amount is reasonable "does not involve the use of a mathematical equation yielding a particularized sum").

\*   \*   \*

Given the legal and factual disputes that persist, this settlement represents a substantial recovery for class members. Application of Rule 23(e)(2) and the *Grinnell* factors weighs in favor of issuing preliminary approval of the settlement. In the event that a substantial number of

objectors come forward with meritorious objections, the Court can reevaluate its determination then. Because the settlement, on its face, is "fair, adequate, and reasonable, and not a product of collusion," *Frank*, 228 F.R.D. at 184, the Court should grant preliminary approval.

**CERTIFICATION OF THE RULE 23 SETTLEMENT CLASS IS APPROPRIATE**

Preliminary approval should be granted because the Court is likely to certify the Settlement Class for purposes of judgment. *See In re GSE Bonds Antitrust Litig.*, 2019 WL 6842332, at *5 ("In order to preliminary approve the settlement proposals, the Court must also find that it will likely be able to certify the class for purposes of judgment on the proposal.").

**I.      Rule 23(a) is Satisfied**

The prerequisites for class certification under Rule 23(a)(1)–(4) are met here: numerosity, commonality, typicality, adequacy of representation, and ascertainability. *Rosenfeld*, 2021 WL 508339, at *9.

Numerosity is satisfied because Defendant has represented that, during the Class Period, there were at least 67 individuals that the Parties agree were in an Eligible LGBTQ+ Relationship who sought and were denied coverage for infertility services due to Aetna's Definition of Infertility. Ex. 1 at ¶ 52(a); *see Consol. Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995) ("[N]umerosity is presumed at a level of 40 members."). Based on Class Counsel's fact investigation and discovery, Plaintiffs have strong reason to believe that there are additional Class Members not identifiable via Aetna's records due to (1) the inability to identify whether certain individuals who were denied coverage for infertility benefits were in an Eligible LGBTQ+ Relationship; or (2) the "chilling effect" caused by Aetna's Definition of Infertility, whereby some individuals did not submit claims for infertility benefit coverage because they believed, based on the plain language of Aetna's policy, that such a submission would be futile. Salzman Decl. ¶ 20.

The Settlement Class raises common questions of law and fact, including whether Class

Members were denied coverage for infertility benefits that otherwise would have been covered by their Aetna health benefit plan but for their failure to meet Aetna's Definition of Infertility, whether such denials were based on Class Members' sex, and whether these denials violated federal or state law. *Id.* ¶ 9. The claims of the Named Plaintiffs are typical of the claims of the Settlement Class, in that Emma Goidel, Ilana Lee, Madeleine Lee, and Lesley Brown seek injunctive and monetary relief for the denial of coverage for infertility benefits due to Aetna's Definition of Infertility. *Id.* Because all Class Members possess the same kinds of claims against the same Defendant, arising out of the same pattern of conduct, and alleging the same violation of law, they meet the commonality and typicality requirements. *Rosenfeld*, 2021 WL 508339, at *9; *Johnson v. Nextel Comms. Inc.*, 780 F.3d 128, 137 (2d Cir. 2015) ("Where the same conduct or practice by the same defendant gives rise to the same kind of claims from all class members, there is a common question."); *Shahriar v. Smith & Wollensky Rest. Grp., Inc.*, 659 F.3d 234, 252 (2d Cir. 2011) ("Typicality requirement is satisfied when each class member's claim arises from the same course of events and makes similar legal arguments to prove the defendants' liability.").

The Named Plaintiffs will fairly and adequately protect the interests of the Settlement Class: they have supported the prosecution of this litigation for over two years, deferring any individual recovery during that time, and they will be paid at the same time as the other Class Members. Ex. 1 at ¶ 104; Salzman Decl. ¶ 40. As described *supra* (Section III.A.), Class Counsel is qualified, experienced, and able to conduct the litigation and oversee settlement administration. *See Nichols v. Noom, Inc.*, No. 20 Civ. 3677, 2022 WL 2705354, at *5 (S.D.N.Y. July 12, 2022).

Finally, the Settlement Class is ascertainable. Whether an individual was in an Eligible LGBTQ+ Relationship, whether they were in New York and a member of an Aetna health benefit plan, whether they were denied coverage and/or incurred out-of-pocket expenses for fertility

treatments, and whether their injury occurred within the Class Period are based on objective criteria that can be determined from Aetna's records and the documentation provided by Class Members. The Parties have so far identified 67 individuals belonging to Category A and have identified a list of potential Category B and C Class Members. Ex. 1 ¶ 65(a). Further, any Category C Class Members who self-identify based on publication notice will need to meet specific, objective criteria—proving their membership in an Aetna plan, their receipt of infertility treatments during the same period, and their attestation to being in an Eligible LGBTQ+ Relationship, all during the Class Period—to be eligible for class membership. *See In re Petrobras*, 862 F.3d 250, 257 (2d Cir. 2017) ("a class is ascertainable if it is defined using objective criteria that establish a membership with definite boundaries").

## II.     Rule 23(b)(3) is Satisfied

The Settlement Class also satisfies Rule 23(b)(3)'s predominance and superiority requirements. *See Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 81 (2d Cir. 2015).

"Predominance is satisfied if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015). This action has focused on Aetna's policies and practices regarding its Definition of Infertility as it is applied to individuals with a uterus and in an LGBTQ+ relationship with a partner who was incapable of producing sperm due to being an individual who was assigned the female sex at birth, was intersex, or was assigned the male sex at birth and had transitioned or was in the process of transitioning, when they sought infertility benefit coverage from Aetna. Those policies and practices are applied to the Class as a whole and cause harm common to Class Members. As such, the questions of fact and law common to the Class—the existence and content of Aetna policies and practices, the

existence of hard-copy and electronic data regarding Class Members, their denials of fertility benefits, their out-of-pocket payments for fertility treatment, and whether those denials violate the law—predominate over individualized questions. *See Rosenfeld*, 2021 WL 508339, at *10.

Rule 23(b)(3)'s superiority requirement is satisfied when "the costs of bringing individual actions outweigh the expected recovery," and when consolidation "will achieve significant economies of time, effort and expense, and promote uniformity of decision." *In re U.S. FoodServ. Inc. Pricing Litig.*, 729 F.3d 108, 130 (2d Cir. 2013). A class action is the superior method for adjudicating this controversy because there is "no overwhelming interest by class members to proceed individually." *Pub. Emps.' Ret. Sys. of Miss. v. Merrill Lynch & Co.*, 277 F.R.D. 97, 120 (S.D.N.Y. 2011). It is inefficient, costly, and burdensome, in light of the amount of likely monetary recovery, for any individual class member to engage in the level of litigation and discovery necessary to establish Defendant's liability. *Id.*; *Rosenfeld*, 2021 WL 508339, at *10 (minimal monetary recovery made individual litigation unlikely given the effort and expense of litigation, and separate actions would be burdensome and inefficient for municipal defendants and the court). Further, by resolving their claims as a class, individuals can increase their bargaining power, and thus potential recovery. *In re GSE Bonds Antitrust Litig.*, 2019 WL 6842332, at *5.

There is no other class action pending in New York challenging Defendant's LGBTQ+ infertility benefits coverage practices, and Class Counsel is not aware of individual claims brought by Class Members (who are limited to New York Aetna members) against Defendant arising out of the same allegations as in the Complaint or the Amended Complaint.[10] Therefore, there are no

---

[10] Two other putative class actions, filed after this case was filed, are pending in other jurisdictions and also seek to challenge Defendant's infertility benefits coverage practices as to members in LGBTQ+ relationships. *See Kulwicki v. Aetna Life Ins. Co.*, No. 22 Civ. 00229 (D. Conn.); *Berton v. Aetna Inc. et al*, No. 23 Civ. 01849 (N.D. Cal.). Neither case presents any impediment to preliminary approval of a settlement in this case, as the Agreement expressly releases "only those claims that have been or may be raised by a New York member" of an Aetna plan "in any pending or future putative class action lawsuits alleging that the policies, plan terms, and/or practices described in the Complaint

other lawsuits on these issues that might weigh against preliminary approval of a settlement. *Id.*

Finally, a district court "[c]onfronted with a request for settlement-only class certification . . . need not inquire whether the case, if tried, would present intractable management problems, for the proposal is that there be no trial." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997); *see also In re Am. Int'l Grp., Inc. Sec. Litig.*, 689 F.3d 229, 239 (2d Cir. 2012) ("A key question in a litigation class action is manageability—how the case will or can be tried, and whether there are questions of fact or law that are capable of common proof. But the settlement class presents no management problems because the case will not be tried."). Thus, to the extent there is any concern about the common proof that would be required concerning Aetna's policies and practices, such concerns fall by the wayside in certifying the Settlement Class.

Defendant does not oppose provisional certification of the class for settlement purposes. *See* Newberg § 13:3 ("If a class has not yet been certified, the parties stipulate to the conditional or temporary establishment of settlement classes for the purposes of the agreement."); *County of Suffolk v. Long Island Lighting Co*., 710 F. Supp. 1422, 1424 (E.D.N.Y. 1989) ("negotiat[ing] a proposed settlement . . . prior to certification of the class" is appropriate), *aff'd in part, rev'd in part on other grounds*, 907 F.2d 1295 (2d Cir. 1990).

### THE NOTICE PLAN AND DISTRIBUTION PROCESS ARE APPROPRIATE

The proposed notices to Damages Class Members and Claim Form Package, Bridley Decl. Ex. B-F, and method and sequence of distribution set forth in the Settlement Agreement (the "Notice Plan"), as further described below, comply with due process and Federal Rule of Civil Procedure 23. The Administrator has designed the Notice Plan, in conjunction with the Parties, to

---

and/or Amended Complaint are unlawful." Ex. 1 ¶ 122. Since New York members would not have standing to raise any claims in *Kulwicki* or *Berton*, pending in Connecticut and California respectively, those cases do not prevent approval of the settlement of this lawsuit.

provide adequate, reasonable, and the best practicable notice to Damages Class Members.

## I.  **Individualized Notice**

The Notice Plan requires individualized notice to potential Class Members using a variety of methods. First, Atticus will send a one-page summary notice of the Settlement Agreement and forms regarding Out-of-Pocket Expense and Miscellaneous Harm Submissions, and Proof of Greater Covered Care forms, to all potential Class Members via first-class mail. Bridley Decl. ¶ 6; Ex. 1 ¶ 75. With this mailing, Atticus will also send long-form notices, which will vary depending on the category of Class Member, Ex. 1 ¶ 76, Attestation forms to potential Category B and C Class Members, and Claim Form Submissions to potential Category C Class Members, *id*. ¶¶ 76(b)–76(c). These materials will inform potential Class Members of their legal rights and how they may participate in or opt out of the Class and will direct potential Class Members to the settlement website for further information. Bridley Decl. Exs. B-F.

The address for initial mail notice for potential Class Members identifiable in Aetna's records (Category A, B, and part of Category C Class Members) shall be the address on file with Aetna if they are current Aetna members; for former Aetna members, the Administrator will verify the last known address according to Aetna's database through address research, including through the national change of address database. *Id*. ¶ 5; Ex. 1 ¶ 77. Where the address research does not provide a high-confidence result, Atticus will conduct CLEAR searches. Ex. 1 ¶ 77.

Due to logistical needs involved in Aetna retrieving the information needed to identify potential class members from its internal data systems, Atticus will send individualized notice in two rounds. *Id*. ¶ 75(e). The data necessary to provide notice to the majority of potential Class Members (those who submitted precertification requests or claims from 2017 through 2023) will be ready shortly after the Court's approval of the Parties' proposed Preliminary Approval Order. Salzman Decl. ¶¶ 36(b). To account for any potential Class Members who may have submitted or

will submit precertification requests or claims for infertility services performed prior to Aetna's implementation of the injunctive relief on June 1, 2024 that were not captured by the first round of notice—and accounting for New York law that allows providers to submit claims up to 165 days after the date of service—the data needed for the second round of notice is estimated to be ready in January 2025. *Id.* ¶ 36(c).

Second, for potential Class Members who have not filed a claim 60 days prior to the Bar Date, the Administrator shall send potential Class Members a reminder notice. Bridley Decl. ¶ 10; Ex. 1 ¶ 78. The Administrator shall send potential Class Members a second reminder notice if they have not filed a claim 30 days prior to the Bar Date. Ex. 1 ¶ 79.

Third, if any notices are returned as undeliverable, Atticus will carry out a second round of address research, including CLEAR, to identify a better address match for re-mailing the notice. If any such address is found, the Claim Form Package will be re-mailed. Bridley Decl. ¶ 8; Ex. 1 ¶ 77.

 Fourth, after receiving a claim submission through the settlement administration website, the Administrator shall provide an immediate confirmation on the website, as well as a confirmation by email for those who provided email addresses, that the Administrator has received the information submitted. Ex. 1 ¶ 82. After receiving a completed Attestation from Category B Class Members, or an Attestation and Claim Form Submission from potential Category C Class Members, the Administrator shall send the potential Class Member a confirmation letter confirming receipt of the above forms, as applicable, or a confirmation by email confirming receipt of the same if the Class Member has provided an email address. *Id.*

## II.    Publication Notice and Paid Media Notice

In addition to individualized notice to Class Members, the Notice Plan requires publication notice, including notice through a robust paid and earned media plan. Ex. 1 ¶ 65(e). Class Counsel

and the Administrator will publish the Summary Notice in various media outlets and social media forums, as listed in the Publication Notice Plan, in an effort to give notice to as many potential Class Members as is reasonably practicable. Bridley Decl. ¶ 11. In particular, the Administrator will use targeted advertisements on social media and in paid media, including on websites and in publications with LGBTQ+ audiences, such as The Advocate, Go Magazine, Gay City News, Gay Parent Magazine, and Parents Magazine. *See id*. Ex. G (Publication Notice Plan). Aetna will also publish the Summary Notice on its website in a location agreed upon by the Parties. Ex. 1 ¶ 80.

Class Members who become aware of this settlement via publication notice shall be directed to a toll-free phone number and the settlement website in order to request and access the long-form notice and provide the necessary information to the Administrator (the forms required for Category C Class Members, as detailed above).

### III.   Form and Content of Notices, Settlement Website, Claim Submission, and Class Member Questions

The proposed notices and Claim Form attached to the Bridley Declaration effectively communicate the required information about the Settlement Agreement in plain, easily understood language. Bridley Decl. ¶ 6. The summary notice (Exhibit B) provides all the information that Class Members need to understand their rights in clear, concise, and plain language: the subject of the litigation, the Class definition, and the legal rights and options available to Class Members (including their right to exclude themselves from the Settlement Agreement or to file objections to the Settlement Agreement). *Id*. Ex. B. No important or required information is missing or omitted. The summary notice refers readers to the settlement website for more information and/or to file a claim. *Id*. ¶¶ 14-15.

The long-form notices (*Id*. Ex. C) plainly and accurately inform Class Members of information about: (1) the nature of this litigation, the Settlement Class at issue, the identity of

Class Counsel, and the essential terms of the Settlement Agreement and settlement; (2) how to participate in the settlement; (3) when settlement payments will be distributed; (4) Class Counsel's forthcoming application for attorneys' fees and service awards to the Named Plaintiffs (5) this Court's procedures for final approval of the settlement agreement and settlement, including the date, time, and place of the final approval hearing; (6) how to challenge or opt out of the settlement, if they wish to do so; (7) how to contact the Administrator; and (8) the settlement website address for more information regarding the Settlement Agreement. *Id*. ¶ 7, Ex. C. The long-form notices provide enough information about the settlement generally so that Class Members understand the entire settlement and have the opportunity to lodge any objection they may have. *Id*. ¶ 7, Ex. C. All advertising will carry the toll-free phone number and the settlement website address for potential Class Members to request or access the long-form notice. *Id*. ¶ 9 & Ex. H.

While courts have approved class notices even when they provided only general information about a settlement, the information in the proposed notices here far exceeds this bare minimum and fully complies with the requirements of Rule 23(c)(2). *See George v. Shamrock Saloon II, LLC*, No. 17 Civ. 6663, 2021 WL 3188314, at *7 (S.D.N.Y. July 28, 2021) (class notice plainly and accurately informed class about nature of litigation, settlement class, class counsel and fees, procedures for exclusions and objections, and other key issues); *In re Michael Milken & Assocs. Sec. Litig.*, 150 F.R.D. 57, 60 (S.D.N.Y. 1993) (class notice "need only describe the terms of the settlement generally").

Next, the Attestation and Claim Form Submission (Exhibits E & F) have been designed to maximize participation by Class Members, including by minimizing the required information necessary to verify that the person completing the claim form is a Class Member. Bridley Decl. Exs. E, F.

Atticus will also take numerous additional steps to ensure that class members receive notice, have few difficulties filing claims, and have their questions answered. Atticus will establish a settlement website at www.InfertilityInsuranceSettlement.com for Class Members to obtain information about the Settlement Agreement, including the long-form notices and a copy of the Settlement Agreement, and to file claims online. *Id*. ¶ 14. The website will be available in English and Spanish. *Id.* ¶ 15. Class Members will be able to download forms and mail them to the Administrator if they prefer instead of filing forms through the website. *Id.*

Atticus will also establish a toll-free phone number for Class Members to request a long-form notice be mailed to them or to listen to answers to frequently asked questions. *Id.* ¶ 9. During set hours, live operators will staff the call center and respond to calls from Class Members in English and Spanish. After hours, a toll-free interactive voice response system (IVR) will be available in English and Spanish.

Atticus will also establish a post office box and a dedicated e-mail inbox to allow Class Members to communicate any specific requests or questions. *Id.*

Plaintiffs respectfully submit that this process is fair and amply protects the due process rights of absent class members to know about and participate in the settlement.

## CONCLUSION

Plaintiffs respectfully request the Court grant this motion for preliminary approval of the settlement agreement and enter the proposed preliminary approval order attached to the Salzman Declaration as Exhibit 2. Plaintiffs request that the Court enter the following dates in the Preliminary Approval Order:

(1) Date by which Claim Form Packages shall be mailed: on or before July 17, 2024, Defendant shall provide the Administrator with the list and addresses of potential Class Members currently identified and the Administrator shall

issue the first round of notice; in January 2025, Defendant shall provide the necessary information for, and the Administrator shall issue, the second round of notice;

(2)   <u>Date of Fairness Hearing</u>: at least 1 year after the date of the Preliminary Approval Order;

(3)   <u>Date by which Requests for Exclusion, Objections, and Letters of Intention to Appear at the Fairness Hearing, and Notices of Appearance shall be filed</u>: 15 days prior to the Fairness Hearing;

(4)   <u>Date by which Motion Seeking Final Approval of the Settlement Agreement and Motion for Attorneys' Fees and Costs shall be filed</u>: 15 days prior to the Fairness Hearing.

Dated: May 3, 2024
          New York, New York

EMERY CELLI BRINCKERHOFF
ABADY WARD & MAAZEL LLP

By: _____/s/_____
Zoe Salzman
Debra L. Greenberger
Eric Abrams
600 Fifth Avenue, 10th Floor
New York, New York 10020
(212) 763-5000

NATIONAL WOMEN'S LAW CENTER
Michelle Banker
Noel R. León
Alison Tanner (admitted *pro hac vice*)
Sudria Twyman (admitted *pro hac vice*)
Donya Khadem (admitted *pro hac vice*)
1350 Eye Street NW, Suite 700
Washington DC 20005
(202) 588-5180