UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

EMMA GOIDEL, ILANA LEE, MADELEINE
LEE, And LESLEY BROWN, on behalf of
themselves and all others similarly situated,

                  *Plaintiffs*,

    -against-

AETNA LIFE INSURANCE COMPANY,

                  *Defendant*.

Case No. 1:21-cv-07619 (VSB)

**DECLARATION OF
ZOE SALZMAN**

      ZOE SALZMAN, an attorney duly admitted to practice in the Southern District of New York, declares under penalty of perjury:

      1.      I am a partner at Emery Celli Brinckerhoff Abady Ward & Maazel LLP ("ECBAWM"), attorneys for the Plaintiffs in the above-captioned matter.

      2.      I respectfully submit this declaration in support of Plaintiffs' Motion for Final Approval of the class action settlement agreement (the "Settlement Agreement" or "Settlement"), attached as Exhibit 1, and to ask the Court to enter the Proposed Final Approval Order, attached as Exhibit 2.

      3.      Attached hereto are true and correct copies of:

          a.      The Settlement Agreement (Exhibit 1);

          b.      The Proposed Final Approval Order (Exhibit 2);

          c.      The Proposed Judgment (Exhibit 3); and

          d.      The one objection to the Settlement Agreement (Exhibit 4).

      4.      As detailed in our prior submissions to the Court, Defendant has agreed to implement injunctive terms of the Settlement and to pay a settlement award to each person who

was denied coverage for fertility-related services because of Defendant's prior Definition of Infertility,[1] whereby individuals in Eligible LGBTQ+ Relationships, unlike individuals in heterosexual relationships, were required to pay out-of-pocket for 6 or 12 cycles of artificial insemination before they could access their health plans' coverage for these same treatments.

5.    Because the proposed settlement satisfies all of the criteria for final approval, the Parties respectfully request that the Court:

      a.    Grant final approval of the Settlement Agreement, including Appendix A (Administrator Proposal) and Appendix B (Allocation Plan) thereto, Ex. 1;

      b.    Certify the two settlement classes (the "Injunctive Settlement Class" and the "Damages Settlement Class") for purposes of final approval;

      c.    Approve attorneys' fees and costs in the amount of $1,625,000; and

      d.    Approve service awards for the four Named Plaintiffs of $15,000 each.

6.    This declaration does not detail the full settlement or set out the entire history of the case. The declaration sets out only those aspects of the litigation and settlement that are not readily apparent from other documents attached as exhibits to this declaration or otherwise available to the Court.

**Pre-Complaint Investigation**

7.    Before filing the action, Class Counsel thoroughly investigated the underlying claims and collected significant factual information. Class Counsel conducted interviews of the Named Plaintiffs regarding their experiences; researched the claims and the application of Section 1557 of the Patient Protection and Affordable Care Act to the facts of this case, including as related to applying Section 1557 to third-party insurance administrators; and

---

[1] Unless otherwise defined, all capitalized terms herein have the same meaning as in the Settlement Agreement. *See* Ex. 1.

researched medical standards regarding artificial insemination and other fertility-related issues, including as related to women in same-sex relationships.

**Discovery and Information Exchange**

8.      During discovery, Class Counsel diligently pursued all information relevant to Plaintiffs' claims, including through serving numerous rounds of discovery requests and reviewing tens of thousands of pages of documents Defendant produced (in total, Aetna produced approximately 77,400 pages of documents), which were used to understand the strengths and weaknesses of Plaintiffs' claims. The discovery requests sought relevant policies, practices, and directives of Aetna; electronic and hard-copy data regarding the design and implementation of CPB 327; staff training materials related to fertility treatment-related insurance coverage; internal Aetna electronic communications regarding design and implementation of the CPB; and information about and examples of the denial or approval of infertility benefits for LGBTQ+ individuals. Class Counsel and Aetna engaged in numerous rounds of meet and confers to identify the types of data that could lead to the identification of class members, including through several searches of Aetna's different internal databases, which involved multiple rounds of exchanging and negotiating search terms and other search parameters. This discovery allowed Class Counsel to evaluate the merits of Plaintiffs' claims ahead of settlement negotiations.

9.      Class Counsel consulted with experts and consultants, including an expert on infertility treatments and the insurance industry related thereto, to determine the appropriate injunctive relief for Injunctive Class Members and the best avenues to identify and appropriately compensate all Damages Class Members.

3

**Negotiation of the Settlement**

10.    Class Counsel and counsel for Aetna had preliminary settlement conversations for some time, but a settlement of this case was explored in earnest beginning in May 2023, when the Parties believed that document discovery was complete or near complete. At that point, the Parties identified a settlement framework and agreed to pause further fact discovery, except as it related to discovering the individuals who may be potential Damages Class Members.

11.    Class Counsel conducted significant data analysis in the course of settlement negotiations. For example, Class Counsel estimated, coordinating with counsel for Aetna, the number of individuals in Eligible LGBTQ+ Relationships who could be identified in Aetna's files who may have sought, been approved for (after incurring out-of-pocket expenses to meet the Definition of Infertility), or denied coverage for artificial insemination or IVF within the Class Period; calculated the individual damages incurred by the Named Plaintiffs and estimated the average damages likely to have been incurred by Damages Class Members due to denials of coverage; researched and reviewed expert medical research studies to tailor potential injunctive relief; analyzed and researched the relevant insurance codes associated with the relevant fertility procedures so as to conduct searches within Aetna's systems for data related to those insurance codes; and consulted with an industry expert and physician with personal knowledge of the fertility treatment process to determine the appropriate injunctive relief and the appropriate damages compensation.

12.    The Parties had multiple in-person and video arm's-length negotiation sessions between May and September 2023 regarding the terms of a potential settlement.

13.    After extensive discussion about the proposed scope and size of the class and the structure of any settlement, the Parties agreed in principle as to the structure of Category A, B,

and C Class Members; the Default Dollars for Benefits Amount of $2,300; a Common Fund to pay the Default Common Fund Amount and, to the extent funds remain, other categories of damages; and that any settlement related costs, including administration, notice, class representative service awards, and attorneys' fees and costs would be paid by Defendant, separate and apart from the Common Fund.

14.    Given the complexity and size of this settlement, the Parties decided to first negotiate a term sheet memorializing these essential terms before negotiating the details of a comprehensive settlement. The Parties agreed on the scope of the Category A Class Members, and Defendant agreed to coordinate with Class Counsel to determine the best way to identify potential Category B Class Members within Aetna's system and to ensure all potential Category C Class Members received proper notice of the settlement.

15.    The Parties negotiated the manner, extent, and nature of notice to potential Damages Class Members extensively. While the Parties anticipated having identified most members of the class via the database searches that identified Category A Class Members, it was imperative to Class Counsel and the Named Plaintiffs that the settlement administration and notice structure ensured that they could identify and reach as many potential Damages Class Members as feasible. In addition to providing a direct mailing to each potential Damages Class Members identified in Aetna's system, the Parties agreed to issue a publication notice via an agreed-upon set of publications and social media sites.

16.    On September 22, 2023, the Parties informed the Court that a settlement term sheet had been signed, ECF No. 75, but at that time, the Parties had not yet reached agreement on the amount Defendant would deposit into the Common Fund, as well as on several other material terms, including the full scope and method of class notice, the scope and timeline of the

implementation of the injunctive relief, the structure and timing of payment of individual awards, the amounts Aetna would pay for class service awards and for Class Counsel's attorneys' fees and costs, and many other terms.

17.    From November 2023 to April 2024, the Parties exchanged multiple drafts of the settlement agreement and participated in multiple in-person and video meetings to negotiate at arm's-length the outstanding terms.

18.    On December 5, 2023, the Parties participated in a mediation with the Honorable Steven M. Gold (retired). During the mediation, the Parties reached agreement that Defendant would deposit $2,000,000 into the Common Fund.

19.    Subsequently, the Parties also agreed during the mediation that Aetna would pay class service awards of $15,000 per Named Plaintiff and an attorneys' fees and costs award of $1,625,000, separate and apart from the $2,000,000 Common Fund. These amounts were negotiated and agreed to independently of, and only after the Parties had already agreed to, the $2,000,000 amount for the Common Fund. These amounts were also negotiated and mediated with the assistance of Judge Gold, who had reviewed Class Counsel's billing and cost records.

20.    The Parties continued to engage in arm's-length negotiations regarding outstanding open terms over the next few months.

21.    The Parties filed several letters requesting stays of all Case Management Plan deadlines to focus on negotiating the final outstanding terms and to draft an agreement. ECF Nos. 77, 79, 81, 84, 86.

22.    On February 21, 2024, the Parties held a meeting with Judge Gold, who agreed to serve as the Special Master to assist in issuing compensation from the Common Fund. On March

20, 2024, the Parties held another meeting with Judge Gold, who reviewed, gave input on, and ultimately approved the Allocation Plan to administer the Common Fund. Ex. 1, Appendix B.

23.    The Parties' negotiations culminated in an agreement on all terms of the Settlement Agreement, which was executed on April 18, 2024. Ex. 1.

24.    The Named Plaintiffs approved the material terms of the Settlement Agreement and were available during the negotiations and mediation to work with Class Counsel.

**Fairness of the Settlement Agreement**

25.    As discussed more fully in the accompanying memorandum of law, the Settlement represents an extraordinary outcome for Class Members given the attendant risks of litigation. The Settlement is fair and reasonable, securing significant injunctive relief and meaningful compensation for all Damages Class Members.

26.    In terms of injunctive relief, Aetna has implemented the Settlement's provisions, including, *inter alia*, revising the definition of "Infertility" in CPB 327 to the definition published by the American Society for Reproductive Medicine ("ASRM") in 2023,[2] revising CPB 327 so that people in Eligible LGBTQ+ Relationships need not undergo more artificial insemination cycles than heterosexual couples before qualifying for coverage, establishing a new policy regarding intrauterine insemination benefits ("IUI"), making IUI a standard medical benefit, and has implemented programming and training changes to provide public and internal education regarding these policy changes, including implementing all necessary computer programming and changing its automated systems so that IUI is considered a diagnostic benefit

---

[2] *See* Aetna Clinical Policy Bulletin No. 0327 (Infertility), Aetna, https://www.aetna.com/cpb/medical/data/300_399/0327.html (quoting American Society for Reproductive Medicine, "Definitions of infertility: a committee opinion," Practice Committee of the American Society for Reproductive Medicine (Dec. 1, 2023)).

and not subject to precertification requirements, as well as socializing these changes internally so that relevant Aetna employees are aware of this change.

27.     Defendant has also agreed to settle this case for a substantial monetary amount. In the aggregate, Aetna has agreed to pay at least $4,011,600 (the "Class Fund" amount). This includes: (1) the Common Fund of $2,000,000; (2) aggregate Dollars for Benefits payments in the amount of $326,600; (3) attorneys' fees and costs in the amount of $1,625,000, to be paid separate from the Common Fund; and (4) incentive payments totaling $60,000, to be paid separate from the Common Fund.

28.     As detailed in the accompanying memorandum of law, all confirmed Damages Class Members are eligible to receive various forms of monetary relief.

29.     First, separate from the Common Fund, each Damages Class Member will receive at least $2,300, if, according to Aetna's records, the Damages Class Member's claims have not yet been reimbursed for infertility treatments undergone during the Class Period that Aetna has determined should have been covered under the individual's health benefits plan but for the Definition of Infertility. Aetna has reviewed and determined that 142 Damages Class Members—all but one Damages Class Member, whose insurance claim had already been reprocessed—had not been reimbursed and were eligible for the Default Dollars for Benefits Amount, thereby agreeing to pay a total of at least $326,600 to Damages Class Members in this category of monetary relief.

30.     That number may increase, as Damages Class Members were also eligible to submit Proof of Greater Covered Care submissions to the extent their plans would have resulted in a Dollars for Benefits reimbursement exceeding $2,300. Six Damages Class Members

submitted Proof of Greater Covered Care submissions, which Aetna will evaluate. Counsel for Aetna has represented that Aetna expects to complete this review prior to the Fairness Hearing.

31.     Second, all 143 Damages Class Members will each receive a Default Common Fund Amount of approximately $10,000 for damages suffered, paid out of the $2,000,000 Common Fund, totaling $1,430,000.

32.     Damages Class Members also had the opportunity to submit claims for additional compensation for out-of-pocket expenses and for miscellaneous harms stemming from the denial of fertility coverage. 20 Damages Class Members submitted out-of-pocket expense claims and 15 Damages Class Members submitted miscellaneous harms claims, and the Special Master will decide whether to allocate payments for them out of the remaining $570,000 in the Common Fund pursuant to the Allocation Plan. To the extent such payments do not exhaust the $570,000 remaining in the Common Fund, all Damages Class Members will receive a second, pro rata payment.

33.     There were four ways for Damages Class Members to be eligible for Common Fund payments depending on their category: Categories A, B, C, and D.

34.     Category A Class Members are Damages Class Members whom the Parties identified in Aetna's files and agreed were Damages Class Members, prior to the notice period beginning. These Damages Class Members were entitled to the Default Common Fund Amount solely upon verification of their address by the Parties, without any action required of the Category A Class Members. 111 Category A Class Members were confirmed eligible.

35.     Category B Class Members were individuals whom the Parties agreed were denied relevant insurance coverage due to the Definition of Infertility but who needed to submit

the Attestation to attest they were in an Eligible LGBTQ+ Relationship at the time they sought coverage. 19 Category B Class Members submitted the Attestation and were confirmed eligible.

36.     Category C Class Members were all individuals (regardless of sexual orientation) identified as having sought coverage for IVF, but who did not seek coverage for IUI, and thus needed to submit both an Attestation and evidence of out-of-pocket expenses having been incurred for IUI. Given that this category of potential Damages Class Members included heterosexual individuals, the Parties anticipated a low claims rate in this category. Seven Category C Class Members submitted the Attestation and the Claim Submission Form with valid documentation and were confirmed eligible; Aetna is currently evaluating the eligibility of a potential eighth Category C Class Member and counsel for Aetna has represented that it expects to complete this review ahead of the Fairness Hearing.

37.     Finally, Category D Class Members were individuals who were denied coverage for artificial insemination services but whose claims were reversed and thereafter approved within 90 days, and thus needed evidence of having incurred out-of-pocket expenses within that time period to be eligible Class Members. The Parties agreed that Category D-A Class Members were in Eligible LGTBQ+ Relationships and only needed to submit a Claim Submission Form, whereas Category D-B Class Members needed to submit both the Claim Submission Form and the Attestation. Six Category D-A Class Members submitted the Claim Form Submission and were confirmed eligible; no Category D-B Class Members were confirmed eligible.

38.     Named Plaintiffs Emma Goidel, Ilana Lee, Madeleine Lee, and Lesley Brown have expressed their approval of the settlement by agreeing to the Settlement Agreement. Each have also submitted claims for additional out-of-pocket expenses and/or miscellaneous harms.

39.    In accordance with the Settlement Agreement, Plaintiffs have requested in this motion for Final Approval that the Court approve service awards for the Named Plaintiffs in the amount of $15,000 each, to be paid separate and apart from the Common Fund. For the reasons set out more fully in the accompanying memorandum of law, such an award for each Named Plaintiff is reasonable and appropriate in recognition of the dozens of hours of services they rendered on behalf of the class, including: approving material terms of the Settlement and being available during a lengthy settlement negotiation process and during several settlement conferences; assuming the risks to their right to privacy in revealing their private medical records and other intimate information to discovery and scrutiny; their bravery in undergoing personal risk by publicly identifying themselves as individuals in an LGBTQ+ relationship and in need of infertility treatments to build their families; and for any inconvenience, pain, suffering, and other non-pecuniary loss experienced as a result of having been a named plaintiff in this action. The Named Plaintiffs have supported the prosecution of this case for over four years, electing to defer any potential individual recovery during that time, and will be paid at the same time as other Class Members.

**Administration of the Settlement**

40.    According to the notice proposal preliminarily approved by the Court, *see* ECF No. 98 ¶¶ 11-15, the Administrator Atticus Consulting LLC ("Atticus") worked with Class Counsel to implement the notice program.

41.    Class Counsel worked with Atticus on several drafts of the direct notice packet, claim form, and newspaper and magazine advertisements for publication notice.

42.    Throughout the notice period, Class Counsel and Atticus have received questions from potential Class Members through mail, email, and telephone inquiries. Class Counsel and Atticus have worked together to respond to these inquiries.

43.    Should the Court grant final approval of the Settlement, Class Counsel will continue to work with Atticus to administer the Settlement. In particular, pursuant to the Settlement, Class Counsel will work with Atticus in reviewing untimely claims and determining whether potential Damages Class Members established "good cause" for submitting claims past the Bar Date.

**Response from the Class**

44.    As of the date of this filing, the Administrator has received 32 valid claims establishing the eligibility of Class Members.

45.    As the Parties anticipated, the majority of Damages Class Members—*i.e.*, the 111 Category A Class Members—had already been identified prior to the notice period. Still, the notice plan sought the widest possible audience to ensure that all potential Damages Class Members were captured, though the Parties anticipated that the vast majority of the individuals receiving notice were not in an Eligible LGBTQ+ Relationship. *See* ECF No. 94 ¶ 5. Of those individuals, an additional 32 Damages Class Members were confirmed eligible.

46.    No Class Members requested exclusions from the Settlement. Eight individuals submitted exclusion requests, but they all stemmed from the Category C notice class, and none of them submitted the documentation necessary to be eligible Category C Class Members (*i.e.*, an Attestation and Claim Form Submission), which aligns with the Parties' understanding that the Category C notice class would largely not comprise Class Members.

47.     One objection was filed by a non-class member, attached hereto as Exhibit 4. The objection was filed on the basis that the Settlement does not include relief for single heterosexual women also subject to Aetna's Definition of Infertility. Such individuals are not a class within the ambit of the Complaint, which alleges discrimination on the basis of sex, rather than, for example, marital status, and thus not within the scope of this Class.

**Advantages of Settlement**

48.     Various factors counsel in favor of final approval of the Settlement Agreement, both based on its benefits and the risks of continued litigation. Many advantages of the settlement not discussed herein are set out in the accompanying memorandum of law and/or are apparent from the face of the Settlement Agreement.

49.     As detailed above, Defendant has agreed to implement ground-breaking injunctive relief and has agreed to pay significant monetary compensation to Damages Class Members.

50.     Further, given Aetna's extensive data indicating which members sought and were denied fertility benefits due to the discriminatory definition of infertility, the categorization of the Damages Class Members allows for a more streamlined and structured identification process for the Parties and puts less burden on the Damages Class Members to produce documentation they may not readily have access to.

51.     For example, the Category A Class Members—representing the large majority of Damages Class Members—did not have to submit any additional documentation to be entitled to approximately $12,300 each after the Parties verified their address information and that they had not yet had their insurance claims reprocessed. Category B Class Members, the next highest proportion of Damages Class Members, as well as D-A Class Members, only had to submit the

13

Attestation confirming that they were in an Eligible LGBTQ+ Relationship at the time they

sought coverage from Aetna, and thus did not need to submit documentation of their interactions

with Aetna, much of which would date back several years, which they may not have access to, or

which may be onerous, burdensome, and inefficient for Damages Class Members to obtain.

Finally, the inclusion of relatively few Category C Class Members (requiring submission of

documentation evidencing artificial insemination-related expenses being incurred) reflects the

results of Class Counsel's negotiations, securing a notice class that was as inclusive as possible

of the rare potential Damages Class Members who may have had limited or no interactions with

Aetna (perhaps understanding that Aetna would deny them coverage if they sought it), such that

Aetna never formally denied them coverage, but were harmed nevertheless.

52.     This Settlement and the above-described relief components thereof represent a

substantial value to Class Members given the uncertainty and delay attendant to litigation. With a

class period dating back to 2017, significant amounts of necessary data analysis, and novel and

evolving issues of law and fact, this case is extraordinarily complex.

53.     Further litigation here would inevitably cause additional, significant expense and

delay. No depositions have been taken in this case. Absent a settlement, the Parties anticipate the

need for depositions of high-level Aetna executives and other key employees, as well as of the

Named Plaintiffs. Similarly, no expert discovery has been conducted in this case. Absent a

settlement, the Parties anticipate the need for extensive expert discovery, including exchange of

reports and expert depositions.

54.     After discovery, Class Counsel also anticipates summary judgment and class

certification motions, both of which would likely center around many technical and emerging

issues of law, including whether Defendant's prior policy discriminated based on sex under

14

Section 1557 of the ACA, whether Aetna can be held liable under the ACA as a third-party administrator of self-funded plans, and Aetna's likely challenge to the suitability of class certification under Federal Rule of Civil Procedure 23. While Class Counsel believes in Plaintiffs' chances of success on all fronts, both motions present legitimate risks to the class, and considerable time and resources would be expended including on likely appeals of the Court's decisions on class certification and summary judgment.

55.     Even assuming the successful certification of the class and favorable outcomes on summary judgment, a fact-intensive trial regarding damages would still likely be necessary, and depending on the outcome of summary judgment motions, may also be needed to determine certain aspects of liability. Class Counsel believe that Plaintiffs could ultimately establish both liability and damages, a trial would be lengthy, complex, and would require significant factual development, requiring hundreds of additional hours of discovery, plus the time and resources required to litigate dispositive motions, prevail at trial, and then prevail again on appeal. However, Class Counsel are realistic that due to the above obstacles, there are significant risks that further litigation would result in no recovery for Class Members at all.

56.     For a class of people denied the equal right to raise children and plan and grow their family as they choose, the Settlement provides immediate and meaningful relief. Without a settlement, Class Members would not obtain relief for years—and would potentially continue to be denied the infertility treatments they need. The Settlement represents a significant percentage of the best possible recovery and makes relief available to Class Members efficiently and without the significant delay of trial and subsequent appeals.

*Attorneys' Fees and Costs*

57.     The Settlement allows Class Counsel to apply for an award of attorneys' fees and costs, and Defendant has agreed to pay such an award in the amount of $1,625,000, separate and apart from the Common Fund. Ex. 1 ¶¶ 96-97. Defendant also agreed not to object to or oppose Class Counsel's application for attorneys' fees and costs. *Id*. ¶ 96.

58.     As indicated in the below chart, the current lodestar for ECBAWM is $1,013,207.50. While Class Counsel litigated this case on a fee-shifting basis, the hourly attorney rates used in calculating the lodestars for ECBAWM are rates the firm charges clients who pay our firm on an hourly basis. Combined with the National Women's Law Center's lodestar of $936,107.55, *see* Declaration of Michelle Banker ¶ 2, Class Counsel's lodestar is $1,949,315.05, which is approximately 18% higher than the requested fee award.

59.     The following chart represents the calculated lodestar for ECBAWM:

| Individual | Hours | Rate(s) | Total |
|---|---|---|---|
| Debra L. Greenberger | 117.4 | $750-$800 | $88,260 |
| Zoe Salzman | 407.7 | $725-$775 | $296,367.50 |
| Noel León | 389.9 | $575 | $224,192.50 |
| Eric Abrams | 448.1 | $500-$525 | $225,137.50 |
| Francesca Cocuzza | 158 | $575 | $90,850 |
| Andrew Jondahl | 87.90 | $575.00 | $50,542.50 |
| Nick Bourland | 0.80 | $550.00 | $440.00 |
| Katherine Rosenfeld | 1.50 | $775.00 | $1,162.50 |
| Diane Houk | 1.80 | $750.00 | $1,350.00 |
| Richard Emery | 2.30 | $1,000.00 | $2,300.00 |

| | | | |
|---|---|---|---|
| Sonya Levitova | 3.20 | $500.00 | $1,600.00 |
| Dan Eisenberg | 0.60 | $575.00 | $345.00 |
| Ananda Burra | 0.90 | $575.00 | $517.50 |
| Summer Associates | 56 | $260 | $14,560 |
| Paralegals | 69.2 | $225-$250 | $15,582.50 |
| **Total:** | **1,745.3** | | **$1,013,207.50** |

60.     The chart above illustrates the number of hours billed by each ECBAWM timekeeper, the timekeeper's hourly rate, a total for each timekeeper, and a total of all of the attorneys' fees ECBAWM has expended on this case.

61.     Specifically, as of September 24, 2025, ECBAWM billed more than 1,745 hours litigating this case.

**The Hours Expended and That Will Be Expended on This Case Are Reasonable**

62.     As described *infra*, the number of hours expended by Class Counsel is reasonable, especially in comparison to the extraordinary result achieved for Class Members. As a result of the significant time invested by Class Counsel in litigating the case, pursuing every avenue of success across over four years of litigation, negotiating a monetary settlement with significant and favorable nonmonetary settlement terms, diligently and creatively overseeing notice to the class, and ensuring that notices and claim forms would be easy to understand and simple to file, as of September 25, 2025, 142 Damages Class Members will receive, at minimum, approximately $12,300 each in a monetary award (with one member receiving, at minimum, $10,000, due to having had their insurance claim already reprocessed by Aetna), in addition to the benefit of significant injunctive relief in the form of Aetna policy changes.

63.     I served as the primary partner working on this case from pre-filing investigation through discovery and settlement negotiation and during settlement administration. When the case was first being investigated and filed, as well as at key moments during discovery, settlement negotiations, and settlement administration, my partner Debra L. Greenberger provided advice and expertise and reviewed critical documents in the case. In general, I typically worked with one or two more junior attorneys at any given time on the daily litigation of the case: (1) Noel R. León and Francesca Cocuzza when this case was first filed and during initial stages of discovery, (2) Andrew Jondahl during key periods of document discovery requiring significant document review hours, and (3) Eric Abrams during further fact discovery, the near-year-long intensive and frequent settlement negotiations, to finalize the settlement agreement, and to assist with administering the Settlement. Seven other attorneys, listed in the above chart, billed small amounts of time to this case (totaling 7.6 hours) for tasks including strategic discussions, research, and proofreading.

64.     All of this time was contemporaneously entered into our system. The attorneys and paralegals at ECBAWM all record their time in all cases contemporaneously by typing into a computer program maintained by the firm for the purpose of tracking time and costs. The attorneys and staff record the date and total time spent on a given matter that date, the tasks performed for the matter, and the amount of time each task took. Time is billed in six-minute increments, or one-tenth of an hour.

65.     I have reviewed the time records documenting the time spent by myself and other ECBAWM attorneys on litigating this case and certify that the records reflect the work reasonably and necessarily performed by ECBAWM attorneys in connection with this case.

66.    Class Counsel has not submitted its detailed billing records containing descriptions of the work performed on the case because those entries contain information protected by attorney-client and attorney work product privileges. It would be burdensome to redact years of daily time entries of privileged information, and under authority in this circuit, such detailed review is not necessary or appropriate for an award of attorneys' fees based on a percentage or lodestar-plus-multiplier approach; we will provide such records, however, at the Court's request. Judge Gold reviewed these records as part of the mediation of the fees in this case.

67.    As described further below, Class Counsel expects to continue to spend significant time and effort to ensure proper administration of the Settlement.

**ECBAWM's Hourly Rates Are Reasonable and Standard in the Market**

68.    ECBAWM is a litigation boutique that focuses on civil rights, commercial, criminal, and attorney ethics matters. We represent individuals, businesses, and institutions in all aspects of litigation and pre-litigation dispute resolution, from negotiation, mediation and arbitration, through hearings, trials, and appeals.

69.    The primary ECBAWM attorneys who worked on this case are myself, partner Debra L. Greenberger, associate Eric Abrams, and former associates Noel R. León, Francesca Cocuzza, and Andrew Jondahl. The primary paralegals working on this case are ECBAWM paralegal Lyra Straley and former paralegal Alexander Gonzalez-Torres. Other ECBAWM paralegals, associates, and partners provided occasional assistance and their time is also documented in our contemporaneous time records and summarized in the chart above.

70.    ECBAWM routinely charges and receives from its hourly clients: $800 per hour for Debra L. Greenberger; $775 per hour for me; $525 per hour for Eric Abrams, and the same

rates for attorneys with comparable levels of experience and qualifications; as well as $250 per hour for the work of paralegals. These rates have increased slightly since ECBAWM began working on this case in 2021. The range of hourly rates is reflected in the chart above.

71.    All of the attorneys on this case have worked on cases in which clients retained us and paid us and our paralegals on an hourly basis at these rates to pursue their claims, including on commercial matters and on civil rights matters.

72.    Based on my knowledge of the New York City legal market, these are all reasonable rates in light of the experience, expertise, and qualifications of these attorneys and paralegals and the prevailing market rates for similarly qualified attorneys and paralegals in New York City.

73.    ECBAWM handles approximately 50% contingency/fee-shifting cases (mostly civil rights, including sexual assault cases) and 50% hourly cases (consisting of employment, occasionally civil rights, and mostly complex commercial cases). ECBAWM did not take this case on a pro bono basis to give its attorneys experience or to improve its reputation. ECBAWM took this case intending to recover fees if its clients prevailed. ECBAWM would not be able to pay its attorneys, support staff, and overhead costs if it did not prevail in the vast majority of its fee-shifting civil rights cases.

74.    The requested rates are particularly reasonable because the risk of little or no recovery in this case was high at the time Plaintiffs filed this lawsuit. Had Class Counsel not succeeded, we would have received no payment for our work.

75.    ECBAWM has been recognized by numerous judges for the quality of its civil rights work. Courts have taken "judicial notice of [Emery Celli]'s high reputation, . . . finding it to be one of the most competent, successful, and reputable civil rights firms practicing in this

Court." *Wise v. Kelly*, 620 F. Supp. 2d 435, 445 (S.D.N.Y. 2008) (citation omitted); *see also Harvey v. Home Savers Consulting Corporation,* No. 07 Civ. 2645 (JG), 2011 WL 4377839, at *4 (E.D.N.Y. Aug. 12, 2011) (court had "taken into account the excellent reputation of [ECBAWM] among attorneys specializing in civil rights cases"); *Vilkhu v. City of New York*, No. 06 Civ. 2095 (CPS), 2009 WL 1851019, at *3 (E.D.N.Y. June 26, 2009), *vacated on other grounds by* 372 F. App'x 222 (2d Cir. 2010) (noting ECBAWM's exceptional "collective experience [and] success rate"); *Rosenfeld v. Lenich*, No. 18 Civ. 6720 (NGG) (PK), 2021 WL 508339, at *5 (E.D.N.Y. Feb. 11, 2021) (describing ECBAWM as "well regarded and highly capable"); *Scott v. Quay*, 338 F.R.D. 178, 189 (E.D.N.Y. 2021) (finding ECBAWM to have a "wealth of experience handling complex class actions"); *Betances v. Fischer*, 304 F.R.D. 416, 428 (S.D.N.Y. 2015) (ECBAWM is a "preeminent civil rights firm" ); *Brown v. Kelly*, 244 F.R.D. 222, 233 (S.D.N.Y. 2007), *aff'd in part, vacated in part on other grounds*, 609 F.3d 467 (2d Cir. 2010) (same); *Parks v. Saltsman*, No. 20-CV-6384-FPG, 2024 WL 4440994 (W.D.N.Y. Oct. 8, 2024) (granting ECBAWM attorneys' fees at out-of-district rates due to special expertise in wrongful death actions).

76.     ECBAWM periodically reviews prevailing legal rates in the legal community of firms roughly comparable in size and having attorneys of similar skill, experience, and standing. Indeed, courts have regularly awarded ECBAWM's full requested hourly rates in the past. *See Fair Hous. Just. Ctr. v. Pelican Mgmt., Inc.*, No. 18 CIV. 1564 (ER), 2025 WL 965129 (S.D.N.Y. Mar. 31, 2025) (granting fees at ECBAWM's full attorney rates); *Rosenfeld v. Lenich*, No. 18 Civ. 6720, 2022 WL 2093028, at *4 (E.D.N.Y. Jan. 19, 2022) (ECBAWM's rates "reflect rates . . . regularly accepted in this Circuit and well within the range of reasonableness"); *T.E. v. Pine Bush Cent. Sch. Dist.*, No. 12 Civ. 2303 (S.D.N.Y. 2015) (awarding ECBAWM partner and

associate their full requested hourly rates); *Short*, *v. Manhattan Apartments, Inc.*, 286 F.R.D.

248, 255-57 (S.D.N.Y. 2012) (awarding ECBAWM partner her full hourly rate); *Short v.*

*Manhattan Apartments, Inc.*, No. 11 Civ. 5989, 2013 WL 2477266, at *8 (S.D.N.Y. June 10,

2013) (awarding over $500,000 in fees at then current hourly rates for ECBAWM and its co-

counsel); *Harvey v. Home Savers Consulting Corp.*, No. 07 Civ. 2645, 2011 WL 4377839, at *3,

*6 (E.D.N.Y. Aug. 12, 2011) (awarding two ECBAWM partners and one associate their full

requested rates); *Rodriguez v. Pressler & Pressler, L.L.P.*, No. 06 Civ. 5103, 2009 WL 689056

(E.D.N.Y. Mar. 16, 2009) (awarding ECBAWM partner his full requested rate); *Wise v. Kelly*,

620 F. Supp. 2d 435, 447-49 (S.D.N.Y. 2008) (awarding ECBAWM partner $425 per hour,

associates $250-$300 per hour).

**Background and Qualifications of ECBAWM Attorneys**

Zoe Salzman

77.     I received my J.D. from New York University School of Law, *magna cum laude*,

in 2007, and my LL.M. from New York University School of Law in 2008. I have 15 years of

litigation experience, including handling class actions and other complex suits. For example, in

2022, I won a $10 million jury verdict in a rape case against a movie director; in 2019, I argued

and won a landmark victory in the First Department Appellate Division that rape and sexual

assault are necessarily motivated at least in part by animus towards the victim's gender, and

therefore prohibited by the New York City Victims of Gender-Motivated Violence Protection

Law.

78.     Prior to joining the firm, I clerked for the Hon. Sterling Johnson, Jr. in the Eastern

District of New York and worked with the International Human Rights Clinic at NYU School of

Law.

Debra L. Greenberger

79.    Debra L. Greenberger received her J.D. from New York University School of

Law, *magna cum laude*, in 2005. Prior to joining the firm in 2007, Ms. Greenberger clerked for

the Honorable Robert A. Katzmann of the Second Circuit Court of Appeals and for the

Honorable Edward R. Korman of the Eastern District of New York.

80.    Ms. Greenberger specializes in complex litigation class actions. For example, she

successfully represented a class of defrauded consumers, which settled for $60 million. *See Sykes*

*v. Mel S. Harris & Assocs.*, 09 Civ. 8486 (S.D.N.Y.). She also represents all current and future

incarcerated people in jails operated by the New York City Department of Corrections, *see*

*Nunez v. City of New York*, 11 Civ. 5845 (S.D.N.Y.), in a longstanding class action challenging

excessive force and other unconstitutional conditions on Rikers Island, recently securing a rare

ruling to appoint a federal receiver.

Other ECBAWM Attorneys

81.    The other attorneys on this matter are also highly qualified. Eric Abrams, an

associate at ECBAWM, graduated from McGill University Faculty of Law with dual J.D. and

B.C.L. (Bachelor of Civil Law) degrees in 2020 and has spent the last nearly three years at

ECBAWM litigating a variety of civil rights and commercial cases. Prior to joining ECBAWM,

they were an associate for over two years at Paul, Weiss, Rifkind, Wharton & Garrison LLP.

82.    Regarding former ECBAWM associates, Noel R. León is a Senior Director at the

National Women's Law Center, leading the organization's Abortion Access Legal Defense Fund

(and acting as co-counsel on this case), and has represented the putative class since this case was

filed. She obtained her J.D. from the University of Pennsylvania Law School in 2014. Francesca

Cocuzza graduated from Columbia Law School and now works at the NY Supreme Court

Appellate Division First Department; Andrew Jondahl graduated from New York University School of Law and was until recently a Trial Attorney at the U.S. Department of Justice.

ECBAWM Paralegals

83.     ECBAWM paralegals worked nearly 70 hours on this case through September 2025.

84.     The primary paralegals assigned to this case were Lyra Straley and former paralegal Alexander Gonzalez-Torres. Other ECBAWM paralegals assisted on the case as needed for tasks such as cite-checking legal submissions.

85.      ECBAWM paralegals on this case keep track of their time using the same computer program that ECBAWM attorneys use as described above. Their time is summarized in the chart above.

86.     Paralegals assisted with discovery in this case, including downloading productions to our document management system, and reviewing and retrieving documents related to potential Damages Class Members' information within Aetna's complex databases.

87.     Having paralegals perform these tasks helped reduce the fees, because it would have been more costly for ECBAWM attorneys to do them.

88.     I have reviewed the time records documenting the time spent by ECBAWM paralegals on assisting in the litigation of this case and certify that the records reflect the work reasonably and necessarily performed by the ECBAWM paralegals in connection with this case.

**The Costs Expended Are Reasonable, Necessary, and Compensable**

89.     ECBAWM paid a total of $29,301.15 in costs for Plaintiffs through September 24, 2025 that were necessary to the litigation of this case.

90. The chart below shows the costs incurred by Class Counsel to litigate this case. All of these costs were reasonable, necessary, and actually incurred.

91. The costs sought by Plaintiffs for ECBAWM are routinely charged by ECBAWM to its hourly paying clients in civil rights and commercial litigation.

92. Those costs include the Court filing fees; process server fees; e-discovery services (including collection of data, culling of data, and loading of documents produced by Defendant and third parties); Westlaw and LexisNexis charges for legal research; courier/Federal Express; photocopy; and late-night meals and taxis.

93. The expert costs include retaining an expert to consult with during discovery and settlement negotiations, who, as a medical practitioner and expert in the field of fertility—and LGBTQ+-related fertility topics in particular—has extensive industry knowledge of the fertility treatment process and helped Class Counsel determine the appropriate injunctive relief and the appropriate damages compensation

94. The underlying invoices and receipts for each of the costs listed in the chart below are maintained at ECBAWM's offices and are available at the Court's request. I have reviewed the chart above and certify that it reflects the actual costs that were reasonably and necessarily incurred by ECBAWM in connection with this case.

95. The following chart represents the expenses ECBAWM incurred in this case:

| Expense Category | Total Expense Amount |
|---|---|
| Meals & Taxis | $102.42 |
| Discovery Management | $16,186.15 |
| Expert Fees | $7,050 |
| Filing & Court Fees | $451.53 |

| Legal Research | $5,511.05 |
| --- | --- |
| **Total:** | **$29,301.15** |

**Conclusion**

96.     For the reasons stated above and in the accompanying Memorandum of Law, the

Bridley Declaration, and exhibits, we believe the Settlement Agreement is fair and reasonable

and we respectfully ask the Court to enter the Proposed Final Approval Order and the Proposed

Judgment, attached as Exhibits 2 and 3.

Dated:  September 25, 2025
        New York, New York


                                    _____/s/_____
                                    ZOE SALZMAN